# IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

DAVID C. GEVAS,

                Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC., et al.,

                Defendants.

Case Number  16-cv-10599

Hon. John Z. Lee, District Judge,

Hon. Sunil R. Harjani, Magistrate Judge

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants, GHALIAH OBAISI, Independent Executor of the Estate of Saleh Obaisi, M.D., Deceased ("Dr. Obaisi"), and WEXFORD HEALTH SOURCES, INC. ("Wexford"), by and through their attorneys, Matthew H. Weller and Joseph J. Lombardo of CASSIDAY SCHADE LLP; and for their Memorandum of Law in Support of Defendants' Motion for Summary Judgment, hereby state as follows:

## INTRODUCTION

Plaintiff, Plaintiff, DAVID C. GEVAS (hereinafter referred to as the "Plaintiff" or "Mr. Gevas"), brings several claims pursuant to both 42 U.S.C. § 1983 and Illinois state law. (ECF #390-1). Specifically, Plaintiff alleges Defendants provided inadequate and untimely diagnosis and treatment for his lymphoma. *Id.* In addition, Plaintiff makes ancillary claims that he was not provided proper treatment for his atrial fibrillation and sleep apnea.[1] However, he has failed to produce evidence sufficient to create a triable issue of fact regarding the merits of his claims against both Dr. Obaisi and Wexford. Specifically, Plaintiff has not set forth any evidence that the

---

[1] It is telling that even though Plaintiff is bringing claims related to the treatment of his sleep apnea and atrial fibrillation, there are no criticisms of the treatment of these conditions mentioned by the physician that drafted the report attached to Mr. Gevas' proposed Fourth Amended Complaint (*See* ECF #390-1 at pages 31-32).

treatment provided to him at Stateville was a substantial departure from accepted professional standards. Moreover, Plaintiff has not produced sufficient evidence to show that Wexford maintained an unconstitutional policy or practice, or that any such policy or practice was a driving force in his alleged constitutional deprivation. Lastly, even if Plaintiff's claims were sufficient to survive summary judgment, he has failed to come forth with evidence that punitive damages are warranted. As such, because there are no genuine issues of material fact, Defendants are entitled to summary judgment as a matter of law.

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A party can only successfully oppose summary judgment "when it presents definite, competent evidence to rebut the motion." *Essex v. United Parcel Serv. Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997).

### II. Plaintiff Failed to Come Forth With Sufficient Evidence to Prove His Claims of Deliberate Indifference

Correctional officials may not act with deliberate indifference to an inmate's serious medical needs. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference has an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). With respect to the subjective component of the deliberate indifference test, Plaintiff must establish that Defendants actually knew that Plaintiff needed treatment for a serious medical need or risk but nevertheless purposely and deliberately withheld it. *Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. Ill. 1994). Deliberate indifference constitutes unnecessary and wanton infliction of pain, which is "repugnant to the

conscience of mankind," or which is "so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness." *Estelle* at 106-07. Negligence, gross negligence, or even tortuous recklessness is not enough. *Id.*

Furthermore, "[an inmate] is not entitled to demand specific care. He is not entitled to the best care possible. He is entitled to reasonable measures to meet a substantial risk of serious harm to him." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Mere disagreement with a doctor's recommended course of treatment does not constitute deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir.2007). Medical decisions which are classic examples of matters for medical judgment are beyond the Eighth Amendment's purview. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). A prison official "is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). When considering whether care evidences deliberate indifference to a serious medical need, the Court must examine the totality of an inmate's medical care. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). To infer deliberate indifference on the basis of a prison physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir.1997). Moreover, in cases where prison officials delayed rather than denied medical assistance to an inmate, courts require plaintiffs to offer "verifying medical evidence" that the delay (not the inmate's underlying medical condition) caused some degree of harm. *Williams v. Leifer*, 491 F.3d 710, 714-15 (7th Cir. 2007).

A. <u>**Dr. Obaisi Was Not Deliberately Indifferent to Plaintiff's Alleged Atrial Fibrillation Condition**</u>

Plaintiff's claim against Dr. Obaisi regarding the treatment of his atrial fibrillation can be categorized as tenuous at best. To this end, in the May 6, 2014 discharge instruction, Plaintiff's

physician from UIC recommended that Mr. Gevas be prescribed two baby aspirin daily to prevent stroke, Metroprolol 100mg twice daily to control his heart rate, and to follow up with his primary care physician. Plaintiff does not dispute that Plaintiff received these medications according to his prescription. Instead, Plaintiff argues that Dr. Obaisi should have gone above and beyond these recommendations, even though there was no medical indication to do so. As such, Plaintiff's claim against Dr. Obaisi related to the treatment of his atril fibrillation constitutes nothing more than a layman's disagreement with his physician's recommended course of treatment; and thus, does not constitute deliberate indifference. *Edwards* at 831.

To this end, in his proposed Fourth Amended Complaint, Plaintiff criticizes Dr. Obaisi for not following the UIC's physician's recommendation for Mr. Gevas to follow up with his primary care physician. (ECF #390-1 at ¶ 52). However, Dr. Obaisi followed up with Mr. Gevas less than 2 weeks following his release from UIC. (Defendants' Statement of Undisputed Material Facts ("DSOF") at ¶ 21). In addition, Mr. Gevas was seen on no less than 18 occasions leading up to his hospitalization on March 31, 2016. (DSOF at ¶¶ 27-48). During almost all of these encounters, Plaintiff's vital signs, including his hearte rate and blood pressure, were recorded and monitored. *Id.* Thus, Plaintiff's claim that his atrial fibrillation was not properly monitored is in direct contradiction of the evidentiary record.

Moreover, in his proposed Fourth Amended Complaint, Plaintiff alleges that his medication should have been adjusted in response to elevated pulse rates. (ECF #390-1 at ¶ 53). However, Dr. Obaisi did exactly that. To this end, on January 5, 2016, Dr. Obaisi increased Plaintiff's dosage of Metoprolol from 100mg to 600mg. (DSOF at ¶ 36). This dosage increase initially improved Mr. Gevas' symptoms. (*See* DSOF at ¶¶ 41, 45, and 46). When Plaintiff's symptoms worsened, Dr. Obaisi took swift action and sent him to the emergency room. (DSOF at

4

¶ 48). As such, Dr. Obaisi's progressive treatment approach to Plaintiff's constantly evolving symptoms does not constitute deliberate indifference.

Lastly, Plaintiff contends that the "shortness of breath, night sweats, chills, and chest pain [he began experiencing in late 2015]—***may*** be indicative of uncontrolled atrial fibrillation as well as lymphoma" and should have prompted further diagnostic care (ECF #390-1 at ¶ 57). Clearly, this is not a credible fact, but merely conjecture and speculation derived from Plaintiff's own layman opinions. Moreover, during late 2015 and going into early 2016, Plaintiff was seen by 2 physicians at UIC. (DSOF at ¶¶ 33, 38). Thus, if his medical condition was as dire and readily obvious as he claims, then it is reasonable to assume that these physicians would have intervened.

Based upon the foregoing, Dr. Obaisi followed the recommendations from Plaintiff's UIC physicians regarding treatment for his atrial fibrillation. When Plaintiff's atrial fibrillation condition worsened, Dr. Obaisi reacted quickly and appropriately by adjusting his medication and sending him for further care on an emergent basis. Consequently, Plaintiff's claim regarding his atrial fibrillation fails as a matter of law.

**B.     Dr. Obaisi Was Not Deliberately Indifferent to Plaintiff's Alleged Sleep Apnea**

Again relying on the UIC discharge recommendations from May 6, 2014, Plaintiff alleges that Dr. Obaisi was deliberately indifferent to his mild asymptomatic sleep apnea condition by failing to provide him with a CPAP. However, Plaintiff's argument once again is based upon a mischaracterization of the medical evidence elicited in this case.

As an initial matter, the CPAP was one of several alternatives recommended by the discharging physician at UIC. (DSOF at ¶ 19). The same physician also suggeested weight loss or a mouth splint. *Id.* As such, the UIC physician left the decision regarding initial treatment of Mr. Gevas' sleep apnea to Dr. Obaisi. Initially, Dr. Obaisi obtained approval for the CPAP on May 19,

2014. (DSOF at ¶ 22). However, On May 30, 2014, Plaintiff attended a pulmonology evaluation at UIC. (DSOF at ¶ 23). The pulmonologist recommended weight loss to Mr. Gevas in lieu of a CPAP. *Id.* Clearly, Mr. Gevas did not take heed to her advice as he went from 298lbs on January 5, 2015 to 340lbs on June 30, 2015. (DSOF at ¶¶ 25, 28). Moreover, despite over a dozen of subsequent medical encounters with Dr. Obaisi, neither the CPAP machine nor having trouble sleeping are mentioned. (DSOF at ¶¶ 25-47). Instead, Mr. Gevas reported to a mental health professional that the actual cause of him not sleeping well was a loud cellmate. (DSOF at ¶ 24).

Lastly, it is notable that while Plaintiff unfairly criticizes Dr. Obaisi for the delay in providing him with a CPAP, it is Mr. Gevas himself who originally caused a delay in the diagnosis and treatment of his sleep apnea. To this end, on August 6, 2013, Plaintiff was approved for the same type of sleep study that he underwent in May of 2014. (SOF at ¶ 12). However, he refused to undergo the study. (SOF at ¶ 13). Thus, any purported "delay" in Mr. Gevas being provided with a CPAP originated as a result of his own conduct.

For the foregoing reasons, Plaintiff's mild asymptomatic sleep apnea did not require a CPAP in 2014 through 2016. Dr. Obaisi acted reasonably and within the standard of care in treating Mr. Gevas for this condition. Consequently, Plaintiff's deliberate indifference claim against Dr. regarding the treatment of his sleep apnea condition should be dismissed at summary judgment.

### C. Dr. Obaisi Was Not Deliberately Indifferent to Plaintiff's Alleged Lymphoma Condition

Once again relying on the recommendations made during his hospitalization at UIC in April and May of 2014, Plaintiff asserts that Dr. Obaisi was deliberately indifferent in the diagnosis and treatment of his lymphoma because he failed to order a CT scan of his chest in the months after his release from UIC on May 6, 2014. (ECF #390-1 at ¶ 45). Plaintiff's argument heavily relies on a radiologist's report of a CT scan of Mr. Gevas' chest performed on April 29, 2014.

However, Plaintiff's claims are nothing more than a criticism of Dr. Obaisi's medical judgment, which falls outside the purview of the 8th Amendment.

As an initial matter, Plaintiff's theory of liability rests on an erroneous assumption. To this end, the follow-up CT scans ordered by the radiologist from UIC on April 29, 2014 were to monitor micronodules on Plaintiff's lungs to make sure he did not develop lung cancer, not lymphoma. (DSOF at ¶¶ 7, 15). Additionally, there was a recommendation regarding the enlarged lymph node found on the April 29, 2014 CT scan was to "correlate with malignancy." *Id.* This correlation occurred when the lymph node was biopsied on May 5, 2014 and was found to be to have "no significant adenopathy"; thus, ruling out lymphoma at that time. (DSOF at ¶ 18). When Plaintiff's cancer was ultimately detected in 2016, it was because lymphadenopathy was present, not because the micronodules in Plaintiff's lungs had developed into lung cancer. (DSOF at ¶¶ 49, 51). Plaintiff's cancer diagnosis was not confirmed until a repeat biopsy of a lymph node was performed. (DSOF at ¶¶ 51). Thus, while a CT scan of the chest may have resulted in an incidental finding of lymphadenopathy, that is not the medical condition that the CT scan was ordered to monitor. (DSOF at ¶ 49). Clearly, the risks of harmful exposure to radiation do not warrant constant CT scan in the hope of making incidental findings. Thus, Plaintiff's argument is built on a house of cards.

Plaintiff also contends that Dr. Obaisi should have suspected lymphoma based upon fractures of his rib and right clavicle. However, Plaintiff had been complaining of numerous orthopaedic issues for years. In fact, he was seen by an orthopaedic specialist at UIC during the time period in which these fractures existed and that specialist did not suspect lymphoma. (DSOF at ¶ 33). Consequently, the causal relationship between orthopaedic injuries and lymphoma is tenuous at best. In addition, during this time period, Plaintiff was reporting heavy coughing due to

a suspected respiratory infection. (DSOF at ¶¶ 35-46). Thus, it was reasonable for Dr. Obaisi to believe that the fracture of the rib was caused by heavy coughing, especially considering that Mr. Gevas was morbidly obese. By that same token, Plaintiff asserts that Dr. Obais should have suspected lymphoma based upon Plaintiff's respiratory complaints that began in December of 2015. However, Plaintiff reported that his symptoms improved with modalities intended to treat viral and bacterial infections such as antibiotics, steroids, and nebulizer breathing treatments. (DSOF at ¶ 44). Consequently, because Plaintiff was responding to treatment for a respiratory infection, it was reasonable for Dr. Obaisi to believe that he had determined the etiology of Mr. Gevas' ailment.

Moreover, while Plaintiff criticized the timing of his CT scan, this type of medical decision making does not full under the purview of the 8th Amendment. To this end, in *Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911 (7th Cir. 2020), an IDOC inmate sued his prison physician based upon an alleged delay in sending him to the hospital. *Murphy* at 915. The plaintiff's claims were supported by testimony from a retained expert, which stated that the defendant physician "ignored the obvious risk of progression of severe infection [Murphy] ultimately suffered." *Id.* In affirming the District Court's dismissal of the case at summary judgment, the 7th Circuit found that the expert's critiques of the shortcomings in the defendant physician's medical care amounted to nothing more than a difference of opinion regarding whether Murphy should have been sent to the hospital, "a scenario that is insufficient to support deliberate indifference." *Id.* at 916. In reaching its decision, the Court noted that the defendant physician provided a course of treatment that "he thought was the right treatment." *Id.* Consequently, the Court held "failure to seek a particular diagnostic [evaluation], like imaging, is a classic example of a matter for medical judgment, amounting to, [a]t most, medical malpractice." *Id.*; *citing Estelle v. Gamble*, 429 U.S. 97 (1976).

In the case at bar, it is anticipated that Plaintiff will assert that Dr. Obaisi demonstrated deliberate indifference because he "delayed" obtaining a CT scan of Plaintiff's chest. In support of this erroneous argument, Plaintiff will rely on the recommendation of the radiologist that authored the report of April 29, 2014 CT scan. However, Dr. Obaisi's decision to not follow the recommendation of the radiologist amounts to nothing more than a difference of opinion regarding whether Plaintiff should have received a CT scan sooner than March of 2016. It is well documented that the vast majority of pulmonary micronodules do not develop into cancer. (DSOF at ¶ 7). Moreover, the lymph node that was biopsied had already ruled out lymphoma in 2014. (DSOF at ¶ 18). Thus, following the holding in *Murphy*, Dr. Obaisi's decision regarding the timing of Plaintiff's CT scan is a classic example of medical judgment that falls outside the scope of the 8th Amendment. *Murphy* at 916.

Based upon the foregoing, Plaintiff's claim regarding Dr. Obaisi's purported delay in diagnosing his lymphoma should be dismissed at the summary judgment stage.

### D.    Plaintiff Failed to Prove His *Monell* Claim Against Wexford

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court established that a municipality may face liability for money damages under § 1983 only if the unconstitutional act about which the plaintiff complains was caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). "To establish municipal liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the "moving force" behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833-34 (7th Cir. 2012). Thus, to

prevail on his *Monell* claim against Wexford, Plaintiff must show that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

In addition, a plaintiff asserting a policy or practice claim ultimately "must demonstrate that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. "This may take the form of an implicit policy" or "a series of violations to lay the premise of deliberate indifference." *Id.* [internal citations and quotations omitted]. While there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability. It is clear that the conduct complained of must have occurred more than once, or even three times. *See Arita v. Wexford Health Sources, Inc.*, 2016 U.S. Dist. LEXIS 150106, 2016 WL 6432578, at *3 (N.D. Ill. Oct. 31, 2016)(holding there were "no facts—outside of those related to [the plaintiff's] own experience— that plausibly suggest Wexford has maintained a widespread custom or practice of ignoring [] inmates' medical needs."; *see also Taylor v. Wexford Health Sources, Inc.*, 2016 U.S. Dist. LEXIS 76341, 2016 WL 3227310, at *4 (N.D. Ill. June 13, 2016)(dismissing plaintiff's *Monell* claim because the plaintiff did "not allege that any other detainee suffered from similar issues" and only included "a conclusory reference to other prisoners' experiences.").

Here, Plaintiff is not claiming that an explicit written policy is unconstitutional. Instead, he is asserting that Wexford engages in the following unconstitutional practices: maintaining inadequate medical records; hiring unqualified medical staff; and, incentivizing profits over adequate care. (ECF #390-1 at ¶¶ 13-37). However, during the course of fact discovery, Plaintiff has not come forth with any evidence, outside of his own experiences, that demonstrates these

unconstitutional practices exist.  Consequently, because Plaintiff has failed to set forth evidence that a pattern of constitutional violations existed, his *Monell* claim against Wexford fails.

While Plaintiff failed to elicit evidence of a pattern of unconstitutional conduct or institutional negligence on the part of Wexford, it is anticipated that he will nonetheless rely upon reports generated by expert witnesses in a another case from the Northern District, *Lippert v. Godinez,* Case No. 13-cv-3656 (the "Lippert Reports"). However, the Lippert Reports are inadmissible hearsay and should not be considered by the Court on summary judgment[2]. To this end, another case from the Northern District is instructive regarding the admissibility of the Lippert Reports. In *Diaz v. Chandler*, 2016 U.S. Dist. LEXIS 35450 (N.D. Ill. Mar. 18, 2016), defendants moved to strike references to the Lippert Report contained in the plaintiff's LR 56.1 statement of additional facts. *Diaz* at *38. As a threshold matter, the Court determined that "[w]ithout testimony…the report is likely inadmissible unless the court can take judicial notice of it." *Id.* at *38-39.. In holding the Lippert Report was not to be considered in determining whether defendants were entitled to summary judgment, the Court held:

> "the *Lippert Report* is an authored report of unknown reliability prepared for another case. As such, it is not the type of evidence "not subject to reasonable dispute" and thus the court will not take judicial notice of it. Moreover, the report is not even particularly relevant to the court's summary judgment determination here because it does not address whether the specific defendants in this case were deliberately indifferent."  *Id.* at *40-41.; *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (holding district court did not abuse its discretion excluding the Lippert Report when offered as proof that Wexford provided substandard care).

[2] A party cannot avoid summary judgment through inadmissible hearsay evidence. *MMG Financial Corp. v. Midwest Amusements Park*, 630 F.3d 651, 656 (7th Cir. 2011); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (holding that newspaper articles are not proper evidence in assessing summary judgment).

Based upon the foregoing, it is evident that Plaintiff cannot rely on the Lippert Reports to defeat summary judgment

Defendants are aware that in a case from the Central District, *Dean v. Wexford Health Sources, Inc.*, No. 17-CV-3112, 2019 U.S. Dist. LEXIS 219301*, 2019 WL 7041649, *2 (C.D. Ill. Dec. 20, 2019), the Court permitted the admission of the Lippert Reports at jury trial on deliberate-indifference claim "to show notice to Defendants (particularly, to Wexford) that court-appointed experts had reported systemic problems with the process for obtaining offsite diagnostic tests and offsite care, the same issues in this case." As an initial matter, *Dean* has been appealed to the 7th Circuit, and a decision is expected prior to ruling on the present motion for summary. Notwithstanding, it is evident that Mr. Gevas is not using the Lippert Report to show "notice" on the part of Wexford, as the plaintiff did at the jury trial of the *Dean* case. Instead, here, Plaintiff is attempting to use the Lippert Reports for the sole purpose of supporting his *Monell* claim against Wexford. However, Plaintiff should not be allowed to make up for his failure to elicit evidence in support of his *Monell* claim by simply relying on the opinions contained within the Lippert Reports. Instead, as the *Dean* case holds, the narrow exception in which the Lippert Reports can possibly be used is to show "notice" of possible issues at a jury trial. Thus, because the Lippert Reports are inadmissible hearsay and cannot be used as evidence in support of a *Monell* claim at the summary judgment stage, then Plaintiff has failed to come up with sufficient evidence to support his claims against Wexford.

## III .   Plaintiff Failed to Come Forth With Sufficient Evidence to Prove His Claims of State Law Medical Negligence Claims

### A.   Plaintiff's State Law Institutional Negligence Claim Should be Dismissed

Under Illinois state law, hospitals may be held liable for institutional negligence. *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 211 N.E.2d 253 (1965),

*Darling* acknowledged an independent duty of hospitals to assume responsibility for the care of their patients. Ordinarily, this duty is administrative or managerial in character. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 28, 223 Ill. Dec. 1, 678 N.E.2d 1009 (1996) (and authorities cited therein). *HN6* To fulfill this duty, a hospital must act as would a "reasonably careful hospital" under the circumstances. *Advincula*, 176 Ill. 2d at 29. Liability is predicated on the hospital's own negligence, not the negligence of the physician.

For the same reasons that Plaintiff's *Monell* claim against Wexford fails, so does his institutional negligence claim against said Defendant. In this regard, Plaintiff has not come forth with evidence sufficient to show that the alleged inadequate medical care or resulting injuries were caused by anything other than the individual decisions or negligence on the part of the Stateville medical staff. There is nothing to suggest that Wexford failed on an administrative or managerial level. Instead, Plaintiff is relying solely on the inadmissible Lippert Reports to support his institutional negligence claim. As such, Plaintiff's institutional negligence claim fails to have sufficient evidentiary support to survive summary judgment.

### B. Plaintiff's 2-622 Is Insufficient as to His Atrial Fibrillation and Sleep Apnea Claims

735 ILCS 5/2-622 ("2-622") requires a written report from a "reviewing health professional" certifying that there "is a reasonable and meritorious cause for filing of such action." *735 ILCS 5/2-622(a).*[3] Here, the 2-622 report attached to Plaintiff's does not support a medical malpractice action regarding the atrial fibrillation or the sleep apnea claims. To this end, the

---

[3] In federal Court, the proper method to attack a report pursuant to Section 2-622, or lack thereof, should be done via Rule 56. *See Young v. United States*, 942 F.3d 349, 351-352 (7th Cir. 2019).Here, Plaintiff was given leave to file his Fourth Amended Complaint on August 6, 2021 and explicitly instructed that "the Amended Complaint should be filed on the docket." (ECF #391). However, the Fourth Amended Complaint and 2-622 report has not been filed yet. Consequently, because Plaintiff failed to file the Fourth Amended Complaint and supporting 2-622 report has not been filed at the time of Defendants' filing of their summary judgment, Plaintiff's Illinois medical negligence claims should be dismissed.

certifying physician that authored the report solely criticizes Defendants regarding their delay in diagnosing Plaintiff's lymphoma. (ECF #390-1 at pages 31-32 of 32). Specifically, the certifying physician takes issue with Defendants' failure to obtain a CT scan of the chest, as suggested by the May 6, 2014 discharge note, which he or she opines lead to the requirement of "toxic chemotherapy to treat a widespread cancer." *Id.* at page 32. Thus, because neither the issues of atrial fibrillation nor sleep apnea are criticized in the 2-622 report, Plaintiff's Illinois state law negligence claims, as to these conditions, cannot survive summary judgment.

As to the state law medical negligence claims against Dr. Obaisi (individual negligence) and Wexford (institutional negligence) regarding the treatment of Plaintiff's lymphoma, the 2-622 alone is insufficient to survive summary judgment. *See Essig v. Advocate BroMenn Med. Ctr.,* 33 N.E.3d 288, 298 (Ill App. 4th Dist. 2015)("Copeland's written report in this case, although sufficient for purposes of section 2-622 of the Code, was entirely insufficient for the purpose of opposing BroMenn's motion for summary judgment. The most obvious fatal deficiency is that Copeland's written report was not an affidavit, meaning it was not sworn to, notarized, or otherwise made under oath. [citing *Roth v. Illinois Farmers Insurance Co.*, 782 N.E.2d 212, 214 (2002). Instead, in order to prevail on a medical malpractice action, a plaintiff must present opinions from an expert familiar with the methods, procedures, and treatments that make up the standard of care against which the conduct of the doctor may be measured. *Jones v. O'Young*, 154 Ill. 2d 39, 43 (1992). Here, the Court stayed expert discovery until after the Court's ruling on summary judgment. (ECF #272, 282, 305, 324, 339) Thus, if Plaintiff's state law medical negligence claims regarding the treatment of his lymphoma survives this round of summary judgment, Defendants should be permitted to file a second motion for summary judgment regarding said claim in the event that Plaintiff does not come up with proper expert opinions in support of them.

**IV.**    <u>Plaintiff's Claim For Punitive Damages Fails</u>

Plaintiff's claim for punitive damages fails because he has not proven any set of facts that would allow him to recover punitive damages. In this regard, punitive damages may be awarded under 42 U.S.C. § 1983 only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Schaub v. VonWald*, 638 F.3d 905, 922-23 (8th Cir. 2011). Here, while Plaintiff contends the medical care provided for the conditions at issue was negligent, there is no evidence demonstrating Defendants were motivated by an evil intent Therefore, even if this Court finds against the Defendants on the Plaintiff's deliberate indifference claim, it should still grant Summary Judgment to the Defendants on Plaintiff's punitive damages claim.

Moreover, the purpose of punitive damages is to "punish blameworthy behavior and deter defendants from committing future bad acts." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). This Court has already addressed the issue of whether a punitive damages claim against Dr. Obaisi's widow should be entertained, and ruled that it does not serve the purpose of punitive damages. *Flournoy v. Estate of Obaisi*, 2020 WL 5593284, 2020 U.S. Dist. LEXIS 171343*, *46 (N.D. Ill. September 18, 2021)("Imposing punitive damages on Obaisi's estate would not serve those ends. Obaisi is deceased, so can be neither punished for his conduct nor deterred from repeating it.") <u>*citing*</u> *Kahlily v. Francis*, 2008 U.S. Dist. LEXIS 101745*, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008) (dismissing claim for posthumous punitive damages in § 1983 claim because damages could not "punish him or deter him"). Thus, the punitive damages claim against Dr. Obaisi's Estate should be dismissed.

WHEREFORE, Defendants, GHALIAH OBAISI, Independent Executor of the Estate of Saleh Obaisi, M.D., Deceased, and WEXFORD HEALTH SOURCES, INC., respectfully request that this Court enter an Order granting their Motion for Summary Judgment, dismissing this suit with prejudice, and granting any other relief this Court deems just and appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By:  /s/ *Joseph J. Lombardo*

One of the Attorneys for Defendants, GHALIAH OBAISI, Independent Executor of the Estate of Saleh Obaisi, M.D., Deceased, and WEXFORD HEALTH SOURCES, INC.

Matthew H. Weller/ARDC No. 6278685
Joseph J. Lombardo/ARDC No. 6306466
CASSIDAY SCHADE LLP
222 West Adams St., Suite 2900
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 – fax
mweller@cassiday.com
jlombardo@cassiday.com

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2021, I electronically filed the foregoing document with the clerk of the court for Northern District of Illinois, Eastern Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ <i>Joseph J. Lombardo</i>