## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DAVID GEVAS, | |
| Plaintiff, | 16 C 10599 |
| v. | Hon. Judge John Z. Lee |
| GHALIAH OBAISI, *et al.*, | Magistrate Judge Sunil R. Harjani |
| Defendants. | |

## FOURTH AMENDED COMPLAINT

David Gevas brings this action against Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Saleh Obaisi (through Ghaliah Obaisi, representative of his estate), Director John Baldwin, and Warden Randy Pfister, and states as follows:

### INTRODUCTION

1. On March 31, 2016, after months of experiencing chest pain, shortness of breath, night sweats, and shoulder pain, Mr. David Gevas, a prisoner in the custody of the State of Illinois, was rushed to the hospital during an acute episode of heart palpitations, dizziness, and chest pain radiating to the left arm. Chest CT scans conducted at an outside hospital revealed that not only was Mr. Gevas suffering from uncontrolled atrial fibrillation, but also his body was riddled with stage IV non-Hodgkins lymphoma that had created weak spots (called metastatic lesions) in his ribs and spine and caused a pathologic fracture of the right clavicle.

2. Almost two years earlier, on May 6, 2014, Mr. Gevas had been discharged from a hospitalization at the UIC Medical Center with diagnoses of atrial fibrillation and sleep apnea (both requiring regular monitoring by a primary care physician) as well as a recommendation

that he receive regular follow-up chest CT scans due to a small pulmonary micronodule that had been found in his lung as well as his risk factors for lung cancer.

3. Defendants did not follow up on the recommendations made by UIC in May 2014, or at any point thereafter. Neither the prison doctor, Dr. Obaisi, nor any of the other Defendants did anything to ensure that a chest CT scan was ordered for Mr. Gevas 3-6 months after his discharge, as had been recommended by UIC. Indeed, in that nearly two-year time period, no CT scan was *ever* ordered. Defendants' failure to timely order diagnostic testing resulted in delayed diagnosis of Mr. Gevas's lymphoma and caused years of unnecessary pain and suffering, including a broken clavicle due to a pathologic fracture, weakening of his spine and ribs due to metastases, curtailed life expectancy and legacy of pain due to the pathological fracture and lytic bone lesions in his spine and rib that would not have occurred had he been treated sooner. Even now, Mr. Gevas continues to suffer ongoing and worsening pain in his back and neuropathy in his feet and legs as a result of spinal compression caused by the lymphoma.

4. Defendants likewise failed to properly monitor and treat Mr. Gevas's diagnoses of atrial fibrillation and sleep apnea. Despite UIC recommending in May 2014 that a CPAP machine be prescribed by the prison doctor to help keep Mr. Gevas's airways open while sleeping at night, Mr. Gevas did not receive that machine for another three years. Similarly, despite UIC doctors recommending follow up with his primary care physician for atrial fibrillation, the prison doctor, Dr. Obaisi, only saw Mr. Gevas once in the seven months after he returned to the facility, and at no point did he assess Mr. Gevas's atrial fibrillation symptoms or even record Mr. Gevas's diagnosis of atrial fibrillation in his medical records. During appointments, Dr. Obaisi downplayed the severity of Mr. Gevas's atrial fibrillation diagnosis, telling the patient that "everyone" has atrial fibrillation.

5.     Defendants' failures to timely authorize outside diagnostic testing, as well as their failure to properly monitor and treat Mr. Gevas's other known serious medical conditions, demonstrate deliberate indifference to Mr. Gevas's significant medical needs, in violation of the Eighth Amendment. Their failures constituted a significant departure from the applicable standards of medical care. Defendants' actions, coupled with Wexford's policies and procedures related to these actions, resulted in a denial of treatment for Mr. Gevas's chronic conditions and delayed his diagnosis of lymphoma, causing severe and unnecessary pain and suffering.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1341(a)(3) and (4), and 28 U.S.C. § 1367 for the supplemental state law claims.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants conduct business in this district, and the events at issue occurred within this district.

## PARTIES

8.     David Gevas is a citizen of the United States and a prisoner in the custody of Illinois Department of Corrections. At all times relevant to this lawsuit, Mr. Gevas was incarcerated at Stateville Correctional Center, located in Crest Hill, Illinois. He is currently incarcerated at Dixon Correctional Center in Dixon, Illinois.

9.     Defendant Wexford Health Sources, Inc. ("Wexford") is a for-profit corporation formed under the laws of the state of Florida with its principal place of business in Pittsburgh, Pennsylvania. At all times relevant to this lawsuit, Wexford was contracted with the Illinois Department of Corrections ("IDOC") to provide medical care to inmates in the custody of the IDOC. As an IDOC agent exercising delegated governmental functions, Wexford and its officers are state actors under 42 U.S.C. § 1983.

3

10.     Defendant Dr. Saleh Obaisi was a physician employed by Wexford and, at all times relevant to this lawsuit, served as the Medical Director at Stateville Correctional Center. Since the events at issue in this lawsuit, Dr. Obaisi has passed away, and is represented in this lawsuit by Ghaliah Obaisi as representative of his estate.

11.     Defendant John Baldwin was the Director of the IDOC at all times relevant to this complaint. Director Baldwin is sued in his individual and official capacity.

12.     Randy Pfister was, at all times relevant to this lawsuit, an employee of the IDOC and the Warden of Stateville Correctional Center. Randy Pfister is sued in his individual and official capacity.

## FACTUAL ALLEGATIONS

### *Wexford's Policies and Procedures Regarding Medical Records*

13.     The State of Illinois, and the Illinois Department of Corrections (IDOC), has a duty to provide medical care that is constitutionally adequate and that complies with medically accepted standards of care. The State has entrusted that duty to Wexford, through their contract to provide medical treatment for inmates in IDOC custody.

14.     Wexford's contract with the IDOC explicitly includes the responsibility to "maintain complete and accurate records of care." The contract requires Wexford to make sure that the medical records are complete and contain accurate, legible entries. Per the contract, Wexford's medical records must include all discharge summaries from hospitalizations, as well as a problem list and all findings, diagnoses, treatments, and dispositions. (Sect. 2.2.3.13.) The contract also requires that Wexford create treatment plans for each patient who requires ongoing care, and requires that treatment plan to include a written statement of the patient's particular

course of therapy and the roles of medical and non-medical staff in carrying out that plan. (Sect. 2.2.3.3.)

15. Despite this responsibility, Wexford, as a private, for-profit corporation, has adopted policies and procedures regarding the maintenance of medical records that are insufficient to meet minimum standards of care and which delay or functionally deny appropriate medical treatment to prisoners in IDOC custody, including Mr. Gevas. While Wexford's own Policy and Procedures manual states that Wexford's medical records are to be "a valuable source of information and guide for treatment management," in reality, the records maintained at Stateville Correctional Center during the dates relevant to this case (and Mr. Gevas's records in particular) failed to do either.

16. At all times relevant to this case, Wexford maintained a system of handwritten, paper records at Stateville, which the court-appointed expert in *Lippert v. Jeffreys* found to be of poor quality in his December 2014 report (Shansky Report). The expert found that problem lists for patients were frequently not updated and were often "cluttered with redundant and irrelevant information…". Wexford's medical records for Mr. Gevas from May 2014 through March 2016 often fail to reflect his serious medical diagnoses of atrial fibrillation and obstructive sleep apnea, and nowhere in Wexford's records do they record the fact that UIC radiologists had found a pulmonary micronodule that required monitoring through regular chest CT scans.

17. The Shansky Report also found that Wexford's medical records were frequently missing important information, such as the patient's medication administration records (or MARs), and the MARs that were available frequently had blanks on them. This makes it impossible for any care provider to determine whether a patient received their prescribed medications and when. It also makes it impossible to track when a patient's prescription needs to

5

be refilled. Mr. Gevas's care is illustrative of this problem—in a seven-year period (from 2010 to 2017), Mr. Gevas experienced over a hundred missed doses of medications, including psychiatric medications and medications for severe pain, because his prescribed medications ran out of stock. These missed medications caused unnecessary pain and suffering. This is a fundamental failure in the most basic aspect of medical treatment and is just one example of the inadequacies of Wexford's policies and procedures regarding maintenance of medical records.

18.     Dr. Shansky also found that most medical notes contained very little information about symptom histories and were often so illegible that they were useless to anyone other than the writer. Dr. Obaisi was one of the worst offenders in this regard, often writing notes that are messy, incomplete, and prevented appropriate follow-up and continuity of care. Several of Dr. Obaisi's notes in Mr. Gevas's medical records from the relevant time frame are completely illegible, even to medical professionals experienced at reading medical notes.

19.     Not only were Dr. Obaisi's notes often illegible, but Dr. Obaisi's notes in Mr. Gevas's file also leave out many symptoms and concerns that Mr. Gevas raised with Dr. Obaisi, including serious symptoms that could have alerted medical professionals to his growing lymphoma months, even years earlier. For example, Mr. Gevas began feeling pain in his shoulder (which later was diagnosed as a broken clavicle caused by the lymphoma) in 2014, years before the lymphoma was found, but Dr. Obaisi did not begin recording these symptoms in the records until January 2015 and, even then, did not order any diagnostic testing related to them. As another example, in late 2015, after Mr. Gevas reported dizziness, productive cough, shortness of breath, and night sweats to Dr. Obaisi, Dr. Obaisi told him he needed an emergency CT scan and collected a sputum sample from him for a culture. But none of this was recorded in the medical record, and when Mr. Gevas attempted to follow-up on the sputum culture and CT

scan at sick call on February 12, 2016, the nursing staff told him (and noted in his record) that they could find no record of the sputum culture, no note of a possible CT scan, and no orders by Dr. Obaisi for a follow-up medical appointment.

20.     The Shansky Report concluded that Wexford's policies and procedures regarding maintenance of medical records resulted in medical records that were so "disorganized and dysfunctional" that it was likely that a less experienced or "less well-informed" clinician would be unable to make appropriate clinical decisions.  The Report went on to make several recommendations, including that problem lists needed to be kept up to date, only providers should have privileges to make entries on the problem lists, and that medical records staff should track all reports and recommendations from outside medical providers to make sure they are filed in the patient's medical records.

21.     In 2018, another court-appointed expert in the *Lippert* case, Dr. Puisis, opined that the medical records at Stateville continued to suffer many of the same deficiencies identified in the Shansky Report. The 2018 Puisis Report found that "almost all provider notes" at Stateville "lack(ed) adequate history, physical examination, assessments, and therapeutic plans," due either to practice issues, inadequate staffing, or both. Evidently, Wexford and its officers made no attempt to address the issues pointed out in the Shansky Report, resulting in deficient care to Mr. Gevas.

22.     In addition to failure to keep problem notes and patient histories up to date, at all times relevant to the events at issue in this complaint, Wexford had no system at the local or the corporate level for tracking and following up on recommendations made by outside experts. Indeed, Dr. Shansky's 2014 report in the *Lippert* case found "breakdowns in almost every area" of the process for obtaining consultations, diagnostics, and procedures from outside providers

and hospitals, "starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork, and delays or the absence of any follow-up visit with the patient." Dr. Shansky went on to find that, while every facility had examples of patients who had received consultations or procedures with no follow up, it was "quite common" at Stateville.

23.     As a result of these findings, Dr. Shansky made several recommendations for IDOC and its vendor, including that medical staff track the entire process in a logbook, that nursing staff meet with patients after they receive an outside service to identify what the ongoing needs are, and that when paperwork is obtained, an appointment with the ordering clinician or Medical Director must occur within one week. Most importantly, the encounters between patient and clinician following an outside service are to be documented in the health file, along with a discussion of the findings and plan.

24.     Dr. Shansky's recommended procedures for follow-up on outside medical consultations were not implemented at Stateville. For Mr. Gevas, this meant that there was no system in place to ensure that the recommendations made by UIC doctors in May 2014 were followed up on, despite the fact that Wexford received a copy of that discharge report. Wexford's failure in this regard violates basic medical care standards and results in delayed or denied treatment.

*Wexford Knowingly Hired Unqualified or Underqualified Medical Staff*

25.     Wexford also hires medical personnel who are not adequately trained or certified for their positions, resulting in inadequate medical care that fails to comply with accepted medical standards or the Constitution. As relevant to this case, Wexford allows doctors who are not trained, experienced, or certified in primary care to work as Medical Directors, where they

8

are responsible for providing, and supervising others in the provision of, primary medical care. This violates medical standards of care. Dr. Obaisi was hired as the Medical Director at Stateville Correctional Center in 2002, despite not being board certified in primary care.

26.     The 2014 Shansky Report was critical of this practice and recommended that IDOC and Wexford adopt a requirement that Medical Directors hired by Wexford must be board certified in primary care, preferably either in family or internal medicine. Despite that Dr. Obaisi did not fit either criteria, Wexford and its officers allowed Dr. Obaisi to continue working as Medical Director (and providing primary care to Mr. Gevas) for years after the Shansky Report came out.

27.     Wexford's failure to hire appropriately qualified primary care physicians, and their decision to allow Dr. Obaisi to work in a role he was not qualified to fill, was a direct abdication of their duty to provide constitutionally adequate medical care to people in IDOC custody, including Mr. Gevas. Wexford and its officers knew that Dr. Obaisi was not qualified for his position, and that Stateville suffered from absence of leadership that was impacted its ability to provide care. yet Wexford failed to act to replace Dr. Obaisi with a Medical Director qualified to provide constitutionally adequate primary care, or to ensure that other Wexford medical staff were providing medical care according to accepted standards of medical practice.

28.     The 2018 Puisis report in the *Lippert* case on Stateville Correctional Center had this to say about Dr. Obaisi (while not naming him by name):

> The prior Medical Director was a surgeon and not appropriately trained in primary care medicine, likely accounting for the preventable morbidity and mortality we identified in record reviews. The lack of appropriately trained physicians was the single most important contributor to preventable morbidity and mortality in our opinion and must be corrected.
> …

9

Based on record reviews, the quality of physician care, particularly care provided by the recently deceased Medical Director, was substandard. This was a serious problem at this facility. We noted multiple cases of morbidity and harm that occurred as a result of poor care. Two death charts reviewed showed preventable mortality. This, in our opinion, is related to use of physicians without primary care training. The recently departed Medical Director was a surgeon who did not appear to know how to manage many primary care problems, resulting in harm to patients. The credentialing and privileging of physicians is inadequate and places inmates at risk of harm. **The prior Medical Director had the worst performance on peer review of all providers at this facility (two of whom were nurse practitioners), yet he was assigned the most complex patients and oversaw clinical care.** We were told that assignments of Medical Directors are made by the Wexford Director of Operations, Regional Manager, with input from the Regional Medical Director. … Lay persons do not have the ability to review the qualifications of physicians. Assignment of physicians not trained in primary care to be in charge of primary care at a facility places inmates at risk of harm.

29.     Wexford's website boasts about their Quality Management Program, through which they claim to "monitor and evaluate the quality of patient care, track and report on outcome measures, and ensure contract compliance." Yet Wexford failed to implement any system, at the local level or the corporate level, to track and monitor the grievances filed against the physicians it employed, or to assess the volume of lawsuits filed against those physicians, including Dr. Obaisi. If Wexford had created such a system, Wexford would have identified Dr. Obaisi's repeated and continued failure to provide adequate medical care.

30.     Even before the 2018 Report, Wexford knew of significant problems with the quality of care being provided by Dr. Obaisi.  Dr. Obaisi has been sued at least 40 times due to allegations of inadequate medical care—indeed, Wexford has more lawsuits in Illinois than in any other state.

31.     Wexford also failed to hire adequate numbers of medical care staff and supervisors, with the inevitable result that patients throughout IDOC, and particularly at Stateville, were not provided constitutionally adequate medical care. Indeed, the Shansky Report noted "leadership vacuums" and staffing deficiencies at Stateville, which caused "process and

care breakdowns on a daily basis." Wexford did not act to remedy these staffing deficiencies, as evidenced by the 2018 *Lippert* Expert Report, which found 33% of medical staffing positions were vacant at Stateville and that Stateville had to share its medical staff with the Northern Reception Center, resulting in a situation where Wexford medical staff must "prioritiz(e) assignments to avoid crises as opposed to ensuring that all needed work is done."

32.     Indeed, as Medical Director of Stateville, Dr. Obaisi admitted to the *Lippert* monitors that there were insufficient medical staff and that he had asked for extra time to see patients "because the medical record documentation is so poor that it is difficult to determine what the patient's problems are." Indeed, the 2016-17 Annual CQI audit states that providers have very high caseloads, seeing approximately 20-30 patients daily. Dr. Obaisi further admitted that "Depositions and court appearances for pending litigation are continuing to increase. Due to this, provider's time is divided between depositions and patient care."

*Wexford's Policies and Procedures Incentivize Profits Over Adequate Care*

33.     The contract between Wexford and the State of Illinois disincentivized Wexford providers from seeking outside treatment for patients by requiring a "compensation adjustment" in the event that Wexford providers exceeded the number of allowable outside visits to UIC. The contract specified that Wexford would be held financially responsible for any inpatient admissions above 216 and any outpatient visits above 2,160. This contractual term leads Wexford to ration outside specialty care.

34.     Wexford's procedure for approving referrals is extensive and requires several stages of approval before an inmate can be approved for outside care. Wexford's treatment policies similarly encourage conservative care to cut costs, which causes their employees to

withhold and/or delay necessary medical care from inmates with serious medical conditions requiring diagnostic testing, outside care, or costly medications.

35.     For example, Wexford's policies and procedures for reviewing and evaluating employee performance incentivize staff, including Dr. Obaisi, to limit the number of outside referrals for diagnostic testing or treatment made in a given year. Indeed, Dr. Obaisi's Performance Appraisal Form for February 2014 to February 2015 awarded him a "does not meet expectations" in the category of cost effectiveness, stating that Dr. Obaisi had fallen "short with financial obligations in the area of offsite care and pharmacy" and was "drastically over budget" in those areas. The appraisal further required Dr. Obaisi to "bring forth ideas to the Regional Medical Director and Regional Manager as a means to show that he is attempting to find ways to manage finances in these areas of responsibility."

36.     Awarding negative marks to employees for using offsite referrals and pharmacy disincentivizes medical staff from using their clinical judgment regarding the need for offsite referrals, or from obtaining refills of needed medications from offsite pharmacies when Wexford's pharmacy runs out of stock. This in turn results in delays and denials of needed care. This policy prioritizes Wexford's profits over clinically and constitutionally appropriate medical care.

37.     Moreover, Wexford maintains a policy and procedure of "collegial review." Even if a primary care physician believes a patient should be sent to an outside medical provider for a diagnostic test, treatment, or other consultation, the primary care doctor must first make a referral to Wexford's "Utilization Management" team. This team, which has no familiarity with the patient, has the ability to override the recommendations of the treating physician, often with no explanation or even communication of their decision. This collegial review process removes

12

clinical discretion from treating physicians in another attempt to prioritize the corporation's profit motives over provision of adequate medical care.

*Improper Medical Treatment for Mr. Gevas*

38.     On April 29, 2014, Mr. Gevas was transferred from the Stateville Correctional Center to the University of Illinois at Chicago Medical Center (UIC) surgical center for a lower lip revision. During that visit, he began experiencing heart palpitations and was rushed over to the facility's emergency room. There, it was determined that he was experiencing an atrial fibrillation episode, and he was admitted to the hospital

39.     During his inpatient stay at UIC, a CT scan of his chest was conducted, revealing a small pulmonary micronodule, a small hiatal hernia, and a 6 cm subcarinal enlarged lymph node of questionable significance, of which a biopsy was taken. The biopsy was later determined to be benign, however, when Mr. Gevas was discharged from UIC on May 6, 2014, the discharge summary recommended in a bolded portion of the discharge summary that, "per Fleischner society guidelines," a follow-up chest CT scan be conducted within 6-12 months (or 3-6 months if Mr. Gevas was a smoker, which he was), for the small pulmonary micronodule.

40.     A sleep study was conducted during the April 2014 hospital stay, and Mr. Gevas was diagnosed with a mild case of obstructive sleep apnea. The UIC discharge instructions recommended a nasal continuous positive airway pressure (CPAP) machine. In the alterative, they recommended a mandibular advancement splint, referral to an ENT surgeon, weight loss or behavioral therapy.

41.     For the atrial fibrillation, Mr. Gevas was prescribed two baby aspirin daily to prevent stroke and Metroprolol 100mg twice daily to control his heart rate. The discharge

instructions instructed him to continue those two medications and to follow up with his primary care provider.

42. Dr. Obaisi, Mr. Gevas's primary care provider, did not meet with Mr. Gevas until 13 days after his discharge from UIC. The notes from that visit are largely illegible, but do list Mr. Gevas's diagnosis of sleep apnea. They do not mention, or create any treatment or follow-up plan for, Mr. Gevas's atrial fibrillation or the pulmonary nodule found in his lungs. When Mr. Gevas raised the issue of scheduling the follow-up CT scan with Dr. Obaisi, Dr. Obaisi assured Mr. Gevas that there was "nothing to worry about" and that "everybody has micronodules in their lungs." Dr. Obaisi further assured him that a CPAP machine would be ordered for him, and that he should not be concerned about the diagnosis of atrial fibrillation because lots of people have it.

43. Moreover, a complete copy of the UIC Discharge Summary was received by Wexford's Pittsburgh offices no later than May 12, 2014. Yet nobody in Wexford's corporate offices acted to ensure that appropriate follow-up care was scheduled and provided to Mr. Gevas.

44. Despite the discharge instructions requiring a CT scan within 3-6 months, neither Dr. Obaisi nor any other Wexford employee ever ordered the CT scan. Despite assuring Mr. Gevas during their May 19, 2014 visit that the CPAP was on order, nothing in the medical notes for this period demonstrate that Dr. Obaisi actually ordered or prescribed a CPAP machine, nor did he create any alternative treatment plan for Mr. Gevas's sleep apnea. And Dr. Obaisi did not schedule any follow-up appointment or create any plan to treat or monitor Mr. Gevas's atrial fibrillation. Indeed, Dr. Obaisi did not schedule Mr. Gevas for another medical appointment until January 2015—over 7 months later. This failure, and the numerous failures that followed,

resulted in prolonged and unnecessary physical pain and suffering for Mr. Gevas, as well as profound emotional suffering.

*Delayed Diagnosis of Mr. Gevas's Lymphoma*

45.     The UIC radiologist's instructions were quite clear that a follow-up CT scan was needed within 3-6 months for Mr. Gevas, as a former smoker, to monitor the small pulmonary micronodule. Yet no CT scan was *ever* ordered for Mr. Gevas in the two years that followed. If regular follow up CT scans had been ordered, his lymphoma would have been caught much earlier. Instead, Mr. Gevas suffered for months, even years, with symptoms that indicated lymphoma.

46.     Mr. Gevas began complaining of right shoulder pain in 2014, though Dr. Obaisi did not address these complaints with a diagnosis until January 2015. In January 2015, over one year before he was diagnosed with a clavicle fracture caused by unchecked lymphoma that was raging through his body, Mr. Gevas saw Dr. Obaisi for pain in his shoulder. Dr. Obaisi conducted no physical examination or assessment to determine range of movement or possible cause of the pain. Indeed, Dr. Obaisi did not order a CT scan, x-ray, or any other diagnostic test. Instead, Dr. Obaisi simply diagnosed him with "chronic tendonitis" and prescribed him Motrin. This is not the first time Dr. Obaisi had cavalierly—and incorrectly—given this diagnosis to a patient presenting with chronic shoulder pain without conducting any further diagnostic tests. (*See Blankenship v. Obaisi*, 443 Fed. App'x 205, 207 (7th Cir. 2011). In Mr. Gevas's case, as in Mr. Blankenship's, Dr. Obaisi merely prescribed him Motrin and sent him on his way.

47.     Then, in late 2015, Mr. Gevas began suffering chest pain, shortness of breath, night sweats, and chills that lasted until March 2016. Mr. Gevas saw Dr. Obaisi and reported night sweats, productive cough, dizziness, and chest pain—all symptoms of uncontrolled atrial

fibrillation as well as possible lymphoma. Dr. Obaisi took a sample of his sputum and explained that he would run a culture on it to determine the cause of his illness. Dr. Obaisi also told Mr. Gevas that he needed an emergency CT scan. But Dr. Obaisi never ordered a testing of the sputum sample or a CT scan, and none of these details were recorded in his notes from the visit. Mr. Gevas attempted to follow up on the sputum culture and CT scan at sick call on February 12, 2016. The nursing staff notes from the visit confirm that the nursing staff found no record of the sputum culture, no note of a possible CT scan, and no orders by Dr. Obaisi for a follow-up medical appointment.

48.     In December, Dr. Obaisi diagnosed him with a respiratory tract infection and prescribed antibiotics. An x-ray conducted in January showed a broken rib, and still Dr. Obaisi did not send Mr. Gevas out for a CT scan to further investigate the cause of it, despite that Mr. Gevas was still coughing and had not suffered any trauma to his torso that would have caused the broken rib.

49.     The symptoms continued, and in February 2016, Dr. Obaisi diagnosed asthmatic bronchitis and prescribed bronchodilator treatments. When Mr. Gevas's symptoms continued despite the bronchodilator treatments, still Dr. Obaisis did not order a chest X-ray or CT scan.

50.     On March 31, 2016, Mr. Gevas was in the healthcare unit when he began feeling heart palpitations. He was sent out to St. Joseph's hospital, where a CT scan of his chest was finally conducted. Further CT scans were conducted in the following days, leading to a diagnosis of Stage IV diffuse large B-cell lymphoma. The scans also revealed a clavicle pathologic fracture due to metastatic disease and numerous lytic lesions (weak spots in the bone due to metastatic disease) throughout his spine and ribs.

16

51.     Following this diagnosis, Mr. Gevas underwent six cycles of EPOCH-R chemotherapy over a six-month period. During this period, the medical staff at Stateville frequently delayed for hours at a time the administration of morphine prescribed to him by Dr. Annie Oh and his oncology team at UIC. At one point, after Mr. Gevas had filed several grievances on the medication delays and after Dr. Oh had ordered an increase in his morphine dosage, Dr. Obaisi stopped administration of the morphine for no apparent medical reason.

52.     As a result of the delay in diagnosing Mr. Gevas's lymphoma, he suffered months of severe pain from a broken clavicle and overall weakening of his spine and ribs, caused by the lymphoma which was allowed to grow throughout his body unchecked. He suffered prolonged symptoms of shortness of breath, night sweats, chills, and chest pain for months until he was finally sent to an outside hospital for treatment.

*Inadequate Treatment and Monitoring of Atrial Fibrillation*

53.     In addition to recommending follow up CT scans of the chest, Mr. Gevas's May 2014 discharge instructions also called for follow up with his primary care provider regarding his atrial fibrillation. Despite that recommendation, Dr. Obaisi did not schedule Mr. Gevas for another medical appointment until January 2015—over 7 months later. Throughout that time, Dr. Obaisi did not create a treatment plan for Mr. Gevas's atrial fibrillation, did not monitor Mr. Gevas's symptoms, and did he send him out for further consultation with a cardiologist, despite that Mr. Gevas continued to experience pulse rates as taken by nursing greater than one hundred (100) while at rest on two occasions in the medical clinic indicating that his medication should have been  adjusted to control his ventricular rate.

54.     The doctor's note from that January 5, 2015 visit says nothing about Mr. Gevas's atrial fibrillation or his sleep apnea, but rather mentions his complaints of right shoulder and back pain, which Dr. Obaisi diagnosed as "chronic tendonitis" based on no physical examination.

55.     An April 2015 transfer summary similarly fails to note Mr. Gevas's history of atrial fibrillation or sleep apnea, listing only bipolar disorder, chronic right shoulder pain, and "BPH" (benign prostatic hyperplasia).

56.     While his Metroprolol prescription is listed among the medications he was taking at that time, the chronic conditions in his medical record do not include the atrial fibrillation diagnosis.

57.     The symptoms Mr. Gevas began experiencing in late 2015—shortness of breath, night sweats, chills, and chest pain—may be indicative of uncontrolled atrial fibrillation as well as lymphoma. At minimum, Mr. Gevas's history of atrial fibrillation should have prompted Dr. Obaisi to conduct a chest X-ray and an EKG as well as CT scan of the chest as soon as Mr. Gevas began having such symptoms in view of his medical history.

*Inadequate Treatment and Monitoring of Sleep Apnea*

58.     After a sleep study was conducted during Mr. Gevas's May 2014 hospitalization, UIC physicians recommended a nasal continuous positive airway pressure (CPAP) machine. In the alterative, they recommended a mandibular advancement splint, referral to an ENT surgeon, weight loss or behavioral therapy. But upon return to Stateville Correctional Center, no treatment plan was developed for his sleep apnea.

59.     While Dr. Obaisi assured Mr. Gevas that a CPAP machine would be ordered, Mr. Gevas was not provided with a CPAP machine or alternative treatment plan for his sleep apnea for nearly three years. Indeed, despite regularly receiving nightly CPAP treatment while

hospitalized at UIC to undergo his chemotherapy treatments between April and August 2016,

Dr. Obaisi and the Wexford staff at Stateville Correctional Center did not provide Mr. Gevas

with a CPAP machine until years later.

**COUNT I**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Ghaliah Obaisi for the estate of Dr. Saleh Obaisi)**

60.     The allegations of paragraphs 1 through 1-59 are incorporated herein by

reference.

61.     Dr. Obaisi, while acting under the color of state law, performed his duties in a

manner that demonstrates deliberate and reckless indifference to Mr. Gevas' serious medical

need for diagnosis and treatment of his lymphoma, thus depriving Mr. Gevas of his rights under

the Eighth Amendment of the U.S. Constitution.

62.     Dr. Obaisi was deliberately indifferent to Mr. Gevas' serious medical condition

when he failed to follow the discharge recommendations given by the radiologist at UIC medical

center, which recommended a CT scan within 3-6 months to follow up on the small pulmonary

micronodules found during an April 2014 scan.

63.     Dr. Obaisi was deliberately indifferent when he delayed ordering an X-ray or any

other diagnostic test, despite Mr. Gevas' complaints about shoulder pain in the year preceeding

his cancer diagnosis.

64.     Dr. Obaisi was deliberately indifferent when he failed to order an X-ray or other

diagnostic scan in response to Mr. Gevas' complaints of chest pain, shortness of breath, chills

and night sweats beginning December 24, 2015 and lasting through the end of March 2016,

when Mr. Gevas was finally sent to an outside hospital due to an episode of atrial fibrillation

with rapid ventricular response and associated chest pain.

**COUNT II**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Director Baldwin in his individual capacity and official capacity)**

65.     The allegations of paragraphs 1 through 1-59 are incorporated herein by reference.

66.     At all times relevant, the IDOC had contracted with Wexford to provide healthcare to inmates in IDOC custody, including Mr. Gevas. While the IDOC contracted out its constitutional obligation to provide adequate medical care, the IDOC remains responsible for the actions and inactions of its contractor, Wexford.

67.     Director Baldwin knew or should have known of Wexford's failures to provide adequate medical treatment, including its failure to maintain orderly and effective medical records, its failure to employ qualified primary care physicians, and its failure to adequately follow-up on the recommendations and prescriptions of outside medical providers.

68.     Director Baldwin knew or should have known, from the Shansky Report or elsewhere, that Wexford's deficiencies resulted in delays and denial of needed medical care to prisoners in IDOC custody. Director Baldwin knew or should have known that these failures resulted in unnecessary and prolonged illness, pain and suffering for prisoners in IDOC custody.

69.     Despite his knowledge of Wexford's failings, Director Baldwin did nothing to intervene in the constitutionally inadequate medical care being provided by IDOC's contractor, Wexford. Director Baldwin did not convene an investigation of Wexford's shortcomings, nor did he meet with Wexford to demand improvements in the care being provided to the people in IDOC custody.

20

70.     This is not a situation in which Director Baldwin is entitled to rely on the judgment of Wexford's medical professionals, given that the Shansky Report made clear that Wexford's medical professionals were not providing medical care consistent with the Constitution. Director Baldwin had a personal responsibility to intervene with Wexford to demand that they make improvements and, if they were not willing or able to do so, the IDOC, under Director Baldwin's control, had an obligation to provide that care itself.

71.     Director Baldwin's failure to act to remedy the serious deficiencies in the medical care provided by Wexford, despite a known risk of serious harm to persons in IDOC custody, is deliberate indifference under the Eighth Amendment.

**COUNT III**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Warden Pfister in his individual and official capacity)**

72.     The allegations of paragraphs 1 through 1-59 are incorporated herein by reference.

73.     At all times relevant, the IDOC had contracted with Wexford to provide healthcare to inmates in IDOC custody, including Mr. Gevas. While the IDOC contracted out its constitutional obligation to provide adequate medical care, the IDOC remains responsible for the actions and inactions of its contractor, Wexford.

74.     Warden Pfister knew or should have known of Wexford's failures to provide adequate medical treatment at Stateville Correctional Center, including its failure to maintain orderly and effective medical records, its failure to employ qualified primary care physicians, and its failure to adequately follow-up on the recommendations and prescriptions of outside medical providers.

75.     Warden Pfister knew or should have known, from the Shansky Report or elsewhere, that Wexford's deficiencies resulted in delays and denial of needed medical care to prisoners in IDOC custody. Director Baldwin knew or should have known that these failures resulted in unnecessary and prolonged illness, pain and suffering for prisoners in IDOC custody.

76.     As Chief Administrative Officer, Warden Pfister was responsible for reviewing and resolving prisoner grievances on a variety of issues, including complaints about medical care. As such, Warden Pfister was aware of complaints being made at Stateville about the medical care provided, including those of Mr. Gevas.

77.     Despite his knowledge of Wexford's failings, Warden Pfister did nothing to intervene to make sure that the staff at his facility was appropriately attending to the medical needs of the prisoners in his custody. Warden Pfister did not convene an investigation of Wexford's shortcomings, nor did he meet with Wexford staff at his facility to demand improvements in the care being provided to Stateville prisoners, including Mr. Gevas.

78.     This is not a situation in which Warden Pfister is entitled to rely on the judgment of Wexford's medical professionals, given that the Shansky Report made clear that Wexford was not providing a sufficient number of medical staff at Stateville, was not keeping adequate medical records or treatment plans for patients, had hired unqualified or underqualified medical providers, and were not providing medical care consistent with the Constitution. Warden Pfister had a personal responsibility to intervene with the medical care providers at his facility to ensure that the crises in care identified by the Shansky Report were remedied.

79.     Warden Pfister's failure to act to remedy the serious deficiencies in the medical care Wexford was providing at his facility, despite a known risk of serious harm to persons in

custody at Stateville Correctional Center, is deliberate indifference under the Eighth Amendment.

**COUNT IV**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Against Wexford Health Sources, Inc.)**

80.     The allegations of paragraphs 1 through 1-59 are incorporated herein by reference.

81.     At all times relevant, Wexford, a for-profit corporation, had a contract with the IDOC to provide healthcare to inmates in IDOC custody, including Mr. Gevas. In this capacity, Wexford acted under color of state law and was responsible for the creation, implementation, oversight and supervision of all policies and procedures followed by Wexford and IDOC employees who were medical care providers to IDOC inmates.

82.     Wexford had policies and procedures that discouraged outpatient care and diagnostic testing. Dr. Obaisi and other Wexford personnel acted pursuant to these policies and procedures when they failed to send Mr. Gevas for any follow-up CT scan to monitor the small pulmonary micronodule found by UIC physicians in May 2014, and when they failed to send him out for diagnostic testing, including chest CT scans, when he experienced symptoms associated with acute atrial fibrillation and/or lymphoma beginning in late 2015. These failures amounted to deliberate indifference to Mr. Gevas's serious medical needs.

83.     Wexford had policies and procedures that discouraged ordering supplemental medical equipment, such as CPAP machines. Dr. Obaisi and other Wexford personnel acted pursuant to these policies and procedures when they failed to provide Mr. Gevas with a CPAP machine for nearly three years despite the diagnosis of mild obstructive sleep apnea and

recommendation of a CPAP machine by UIC physicians in May 2014. These failures amounted to deliberate indifference to Mr. Gevas's serious medical needs.

84.     Wexford had a system of providing medical records at Stateville Correctional Center and throughout IDOC that was inadequate to provide continuity of patient care. Wexford knew or should have known, from the December 2014 Shansky Report or earlier, that their recordkeeping was inadequate to provide constitutionally adequate care, yet Wexford failed to act to remedy the situation. Wexford also had a policy or procedure that allowed the hiring of unqualified or underqualified physicians that Wexford knew or should have known, by December 2014 if not sooner, was resulting in constitutionally inadequate medical care to prisoners in the custody of the IDOC.

85.     As a direct and proximate result of Wexford's policies and procedures that violated Mr. Gevas's Eighth Amendment Rights, Mr. Gevas suffered physical and mental injuries, including, but not limited to, delayed diagnosis of a widespread cancer that seriously curtails his life expectancy to a greater degree than if he had been treated sooner and has left him with a legacy of pain due to the pathological fracture and lytic bone lesions in his torso that would not have occurred had he been treated sooner. As a result, Mr. Gevas is entitled to damages under 42. U.S.C. Section 1983.

**COUNT V**
**Medical Malpractice – Illinois Law**
**(Against Ghaliah Obaisi for the estate of Dr. Saleh Obaisi)**

86.     The allegations of paragraphs 1 through 1-59 are incorporated herein by reference.

87.     At all relevant times, it was the duty of Dr. Obaisi to exercise due care and caution in the treatment of his patients, including Mr. Gevas.

88.     Despite this duty, Dr. Obaisi failed to exercise the care that a reasonably careful doctor ordinarily would have used under the circumstances, and he was therefore negligent in his treatment of Mr. Gevas. Dr. Obaisi knew as early as May 2014, that a small pulmonary micronodule had been found in Mr. Gevas' left lung, and that medical standards required a follow-up chest CT scan within 3-6 months, and regularly thereafter, to monitor the situation. Dr. Obaisi knew or should have known that Mr. Gevas' ongoing symptoms of chest pain, shortness of breath, night sweats, and chills for months, as well as clavicle and back pain for over a year, were indicative of something other than asthmatic bronchitis, given that his symptoms did not improve after bronchodilator treatment. Dr. Obaisi received several indications that further diagnostic testing was required to diagnose Mr. Gevas' condition and knew that an outside referral was necessary to Mr. Gevas to receive adequate diagnostic testing. Yet Dr. Obaisi failed to timely gain approval for these diagnostic tests.

89.     As a direct and proximate cause of Dr. Obaisi's negligent acts and omissions, Mr. Gevas suffered severe physical and mental injuries, including delayed diagnosis of a widespread cancer that seriously curtails his life expectancy to a greater degree than if he had been treated sooner, ongoing mental distress, and a legacy of pain due to the pathological fracture and lytic bone lesions in his torso that would not have occurred had he been treated sooner. As a result, Mr. Gevas is entitled to damages.

90.     The medical records pertaining to Mr. Gevas have been reviewed by a licensed and actively practicing physician, who has determined that there is a reasonable and meritorious cause for filing of a medical malpractice claim against Dr. Obaisi (See Ex. A, Affidavit of Harold Hirshman).

## COUNT VI
### Respondeat Superior:
### Medical Malpractice – Illinois Law
### (Against Wexford Health Sources, Inc.)

91.     The allegations of paragraphs 1-59 are incorporated herein by reference.

92.     Wexford, through its agent and employee Dr. Obaisi, accepted Mr. Gevas as a

patient. At all relevant times, this agent and employee was acting within the scope of his

employment with Wexford and had a duty to exercise due care and caution in the treatment of

patients, including Mr. Gevas.

93.     At all relevant times, Wexford, through its agent/employee Dr. Obaisi acting

within the scope of his employment, failed to exercise due care and caution in its diagnosis and

treatment of Mr. Gevas' cancer. Wexford's agent and employee, Dr. Obaisi, received clear and

persistent signs that further testing was necessary to diagnose Mr. Gevas' condition but failed to

provide for the requisite diagnostic testing. Wexford's agent and employee, Dr. Obaisi, also

knew that an outside referral was necessary for Mr. Gevas to receive adequate diagnostic testing.

94.     As a direct and proximate cause of the negligent acts and omissions of Wexford's

agent and employee Dr. Obaisi, Mr. Gevas suffered severe physical and mental injuries,

including delayed diagnosis of a widespread cancer that seriously curtails his life expectancy to a

greater degree than if he had been treated sooner, ongoing mental distress, and a legacy of pain

due to the pathological fracture and lytic bone lesions in his torso that would not have occurred

had he been treated sooner. As a result, he is entitled to damages.

95.     Wexford is vicariously liable for the negligent acts and omissions of its

agents/employee, Dr. Obaisi, in his failure to exercise due care and caution in their diagnosis and

treatment of Mr. Gevas' cancer.

## COUNT VII
### Institutional Negligence – Illinois Law
### (Against Wexford Health Sources, Inc.)

96.     The allegations of paragraphs 1-59 are incorporated herein by reference.

97.     At all relevant times, Wexford, as a health care provider, owed a duty to maintain adequate treatment policies and a duty to review and supervise the care of its patients, including Mr. Gevas.

98.     Despite this duty, Wexford failed to exercise the care that a reasonably careful health care institution would have used under the circumstances, and it was therefore negligent in its care of Mr. Gevas. Wexford knew or should have known that its policies and procedures for approving specialty care and/or outside consultations, approving non-formulary tests and medications, and scheduling outside care constituted barriers to timely care and threats to patient health and safety. Wexford knew that its procedure for record keeping, including the substandard quality of medical notes and treatment plans created and maintained by its providers and by Dr. Obaisi in particular, was inadequate to ensure continuity of care, and that its policy of disincentivizing its employees from requesting outside consultations or diagnostic testing for financial reasons would create barriers to timely care. Wexford knew or should have known that its policies and procedures were likely to, and in fact did, cause delays in the approval and scheduling of Mr. Gevas' diagnostic testing and outside referrals.

99.     Wexford additionally failed to promulgate policies, procedures, and practice to select, staff, and supervise its employees, including nurses, treating physicians, and supervising physicians, that a reasonably careful health care institution would have promulgated and followed under the circumstances, and it was therefore negligent in its care of Mr. Gevas. Wexford knew or should have known that its policies, procedures, and practices for selecting,

staffing, and supervising its employees would likely result in, and in fact did result in, delays or negligent oversight in the diagnostic, pharmaceutical, and other medical care to IDOC inmates including Mr. Gevas. Wexford's staff selection, staffing, and supervision policies, procedures, and practices unreasonably delayed Mr. Gevas' diagnostic testing and outside referrals, and thereby delayed his diagnosis of lymphoma.

100.     As a direct and proximate cause of Wexford's negligent acts and omissions, Mr. Gevas suffered severe physical injuries—including a broken clavicle, numerous lytic lesions (spots of bone damage), months (if not years) of unnecessary pain and suffering from untreated lymphoma, and reduced life expectancy—as well as mental injuries.

101.     The medical records pertaining to Mr. Gevas have been reviewed by a licensed and actively practicing physician, who has determined that there is a reasonable and meritorious cause for filing of a medical malpractice claim against Wexford Health Sources, Inc. (See Ex. A, Affidavit of Harold Hirshman).

**PRAYER FOR RELIEF**

As a result of these violations, Mr. Gevas requests that the Court grant the following relief against Defendants:

a.  Judgment for compensatory damages against all Defendants jointly and severally, in an amount to be determined at trial;

b.  Judgment for punitive damages against all Defendants jointly and severally, in an amount to be determined at trial;

c.  Judgment for nominal damages to vindicate the violation of Mr. Gevas' rights under the Eighth Amendment to the Constitution of the United States;

28

    d.   An award of the costs of this action against all Defendants jointly and severally,

        including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

    e.   Such other and further relief that the Court deems appropriate.

### JURY DEMAND

Mr. Gevas respectfully demands a trial by jury.


            RESPECTFULLY SUBMITTED,
            /s/    Harold Hirshman
            One of the Attorneys for Plaintiff

Harold Hirshman
Samantha Reed
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
harold.hirshman@dentons.com
samantha@equipforequality.org