IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID C. GEVAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 16-cv-10599 |
| | ) | |
| v. | ) | Honorable Judge John Z. Lee |
| | ) | Hon. Magistrate Judge Sunil R. Harjani |
| SALEH OBAISI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO IDOC DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants Baldwin and Pfister have moved for summary judgment based entirely on the strawman argument that Plaintiff only named them in this lawsuit because of their roles in the grievance process. That is incorrect. Both Director Baldwin and Warden Pfister were personally involved in the systemic failure to provide adequate medical treatment to prisoners within the Department of Corrections and at Stateville Correctional Center in particular. They knew that prisoners at Stateville were not getting adequate medical treatment from their vendor, Wexford Health Sources ("Wexford"), and they failed to take reasonable measures to remedy the problems. Their failure to act to remedy these known failures lead Mr. Gevas to suffer for years from uncontrolled atrial fibrillation and untreated sleep apnea and delayed diagnosis of his lymphoma. Defendants have not demonstrated that the undisputed facts necessitate judgment as a matter of law in their favor, and their motion should be denied.

**FACTUAL BACKGROUND**

The Illinois Department of Corrections contracts with Wexford Health Sources to provide medical care throughout the prison system, including at Stateville Correctional Center. WSOF ¶3. In December 2014, an independent medical expert issued a public report (the Shansky

1

Report) detailing the systemic failures of the Department's healthcare system. PSOF ¶¶34-37. The Report identified specific problems affecting patients at Stateville Correctional Center: underqualified physicians, insufficient nursing and other medical staff, insufficient medical leadership, unorganized medical records, failure to maintain logs regarding patients' treatment at outside medical centers as well as delays in sending patients for outside appointments and following up with patients returning from such visits. *Id.* These issues present a real risk of serious harm to patients in the Department's custody who must rely on the Department to coordinate and provide their medical treatment.

This high-profile report was issued while Warden Pfister was the warden at Pontiac Correctional Center (11 months before he became warden at Stateville) and 9 months before Director Baldwin became acting director in August 2015. PSOF ¶¶34, 41, 42, 50; ISOF ¶¶2,3. The problems were ongoing at the time each of them took their positions as relevant to this lawsuit. PSOF ¶42. Indeed, Director Baldwin admitted that he did review parts of the Shansky Report and was aware of problems with the medical care being provided by Wexford from the Report as well as from conversations with people within the Department, including nursing staff and the prisoner population, as well as the outside legal community. *Id.* ¶¶41-46. Director Baldwin admits that he knew that the Shansky Report had identified problems with Wexford hiring underqualified clinicians (PSOF ¶ 41), and he knew that someone in the Medical Director role should have "a very diverse background in a variety of medical practices, hopefully some background in things like either mental health or infectious illness, or a general practice type of background." PSOF ¶48. Dr. Obaisi was both underqualified and lacked a diverse medical background. *Id.* ¶68.

2

Director Baldwin also knew that there was a problem with the quality of the medical records, which was never resolved during his tenure. PSOF ¶46. He knew that Dr. Shanksy had identified a problem with follow-up for prisoners sent out to outside hospitals for certain kinds of health services and admits that this is consistent with Mr. Gevas's allegations in this lawsuit. PSOF ¶41. Director Baldwin also admitted that the Department's medical records cannot show that the Department followed up on Mr. Gevas's medical complaints. PSOF ¶43.

Warden Pfister testified that he never read the Shansky Report, though he was the warden at another IDOC facility, Pontiac Correctional Center, when the Report came out and until he transferred to Stateville in November 2015. PSOF ¶ 50. Defendant Pfister admits that he was "pretty much responsible for the entire facility" of Stateville. PSOF ¶ 49.

The issues identified in the December 2014 Report are the very same issues that lead to inadequate medical care for Mr. Gevas.  In April 2014, Mr. Gevas was admitted at University of Chicago Medical Center (UIC) for atrial fibrillation, a new diagnosis for him. PSOF ¶ 33. He underwent a sleep study during that hospitalization and was diagnosed with obstructive sleep apnea. PSOF ¶ 1. A CT scan was done that found a subcarinal mass and a pulmonary micronodule. PSOF ¶ 5. The mass was biopsied, and he was discharged back to the prison in May 2014 with recommendations for a CPAP machine, a follow-up with his primary care physician for the atrial fibrillation, and a follow-up CT scan in 3-6 months to monitor the pulmonary micronodule. PSOF ¶1.

After Mr. Gevas returned to Stateville Correctional Center, he met with Wexford medical providers, including Dr. Obaisi, but none of them noted the need for a follow-up CT scan in his record. PSOF ¶ 5. The CT scan was never ordered. *Id.* Additionally, Dr. Obaisi told Mr. Gevas he would order the CPAP machine, but Mr. Gevas did not receive the CPAP machine until

August 2017, more than three *years* later. PSOF ¶ 6-8. Mr. Gevas submitted a grievance about not getting the CPAP machine in 2014, but he still did not receive his CPAP machine until August 2017. PSOF ¶7. He similarly filed grievances about not receiving the follow-up treatment recommended by UIC in the discharge instructions sent after his May 2014 hospitalization. PSOF ¶ 7.

In December 2015, Mr. Gevas began experiencing night sweats, shortness of breath, chest pain, congestion, and a productive cough. PSOF ¶ 16. These symptoms continued unabated for three months, during which time he sent letters to Warden Pfister, Director Baldwin, and the owners of Wexford telling them about his symptoms and his fear of dying. PSOF ¶52. On January 14, 2016, he wrote to tell them that an x-ray had just discovered a broken rib, but he had not been seen for follow-up by Dr. Obaisi. *Id.* On January 25, 2016, he wrote to them and told them he was still coughing up phlegm, and still had not been put in for a CT scan. *Id.* And again on February 12, 2016, he wrote to tell them he still had not been put in for a CT scan or had his sputum checked. *Id.*

On March 31, 2016, Mr. Gevas was finally sent to an outside hospital during an episode of uncontrolled atrial fibrillation. PSOF ¶ 26. A CT angiogram revealed numerous pulmonary nodules and lytic lesions consistent with metastic disease (which was later determined to be stage IV Diffuse Large B-Cell Lymphoma (DLBCL)). PSOF ¶ 26, 29.

## LEGAL STANDARD

At summary judgment, this Court has "one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (*quoting Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994)). Summary judgment is only appropriate when there are no genuine

disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

**ARGUMENT**

Defendants' motion is predicated on the idea that Defendants Pfister and Baldwin had no personal involvement in the violations of Plaintiff's Eighth Amendment rights. But these Defendants are personally responsible for systematic conditions within the prisons, including the failing medical system. These Defendants were on notice of several serious and specific, systemic failures including inadequate medical records, understaffing and underqualified leadership (specifically at Stateville), and ongoing problems and delays with scheduling visits and follow-up with outside medical providers. These exact problems lead to Mr. Gevas's injuries related to atrial fibrillation, sleep apnea, and lymphoma. Moreover, these Defendants cannot delegate away their responsibility to resolve issues that are brought to their attention through letters and the grievance process.

**I.     Deliberate Indifference Standard**

Prison officials are deliberately indifferent when they know about a substantial risk of harm but fail to take reasonable measures to prevent the harm from occurring. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Farmer v. Brennan*, 511 U.S. 825, 836-39 (1994) (explaining that Eighth Amendment deliberate indifference is when a prison "official knows of and disregards an excessive risk to inmate health or safety."); *see also* 7th Circuit Pattern Jury Instruction No. 7.17 (Rev. 2017). Mr. Gevas need not prove that Warden Pfister or Director Baldwin intended him harm or even believed that it would occur—rather, "it is enough to show that [Defendants] acted or failed to act despite []knowledge of a substantial risk." *Gray v. Hardy*, 826 F.3d at 1008; *Petties*, 836 F.3d at 728. Because prison officials will rarely "declare, 'I knew

5

this would probably harm you, and I did it anyway!', most cases turn on circumstantial evidence." *Petties*, 836 F.3d at 728.

Deliberate indifference of prison officials can be shown by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir. 1983). A non-medical prison official may still be deliberately indifferent, even if he does not directly provide medical care, if he knows of a serious risk of harm and fails to act. *See Hayes v. Snyder*, 546 F.3d 516, 526- 28 (7th Cir. 2008). A non-medical prison official is not entitled to defer to medical professionals if it is obvious that prisoners are not receiving adequate care. *Id.*

Moreover, Plaintiff does not need to show that he was entirely ignored, or that Defendants did nothing. *See Hayes*, 546 F.3d at 524. Even if Defendants took some steps, a plaintiff can show that Defendants' actions were unreasonable if the Defendant knew the actions were unlikely to be effective at resolving the problem. *Id.*; *see also* 7th Circuit Pattern Jury Instruction No. 7.17 (Rev. 2017). Importantly, reasonableness here is a "quintessential jury question," not something to be decided at summary judgment. *Becker v. City of Evansville*, No. 12 CV 182, 2015 U.S. Dist. LEXIS 8414 (S.D. Ind. Jan. 26, 2015).

## II. A Jury Can Infer That Director Baldwin and Warden Pfister Are Personally Involved in Systematic Prison Conditions

"Where the evidence demonstrates a systemic problem, senior officials like the Warden of Stateville and the Acting Director of IDOC could be expected to have 'personal responsibility' for resolving the situation." *Silva v. Pfister,* No. 18-CV-5214, 2021 WL 1103483, at *7 (N.D. Ill. Mar. 23, 2021) (*citing Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29). "'Systematic' conditions are those that affect a number of individuals rather than one inmate in isolation." *Richard v.*

6

*Baldwin*, No. 17-CV-4677, 2018 WL 6606037, at *4 (N.D. Ill. Dec. 17, 2018); *see also Smith v. Dart*, 803 F.3d 304, 310 n.2 (7th Cir. 2015) ("As the district court correctly noted, the personal involvement of senior jail officials, such as Dart, can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations.").

Here, the systemic and longstanding problems with the healthcare system in Illinois prisons, and specifically at Stateville, were systematic conditions. The problems with medical record keeping, understaffing, underqualified medical director, problems and delays with follow-up from outside medical appointments, were all systemic issues that affected a number of patients throughout Stateville and the Illinois prison system as a whole. The 2014 Shansky Report detailed these systemic issues and put Defendants on notice of these problems.

### a. Director Baldwin Was Aware of Systemic Problems with Inadequate Medical Treatment at Stateville Correctional Center

From the evidence available at summary judgment, a jury could conclude that Director Baldwin was aware of the systematic failures in the medical care being provided by the Department of Corrections and its vendor, Wexford. Director Baldwin testified to his knowledge of these systemic problems. PSOF ¶¶ 41-47, 48. Director Baldwin admits that he knew that an independent, court-appointed medical expert had found many of Wexford's clinicians to be underqualified, he knew that a medical director needed to have a diverse medical background and competency in general practice, he knew that there were problems with the quality of the Department's medical records, and he knew that there were problems with the follow-up on offsite medical appointments such as those at UIC. PSOF ¶¶ 41, 43. These are the very issues that led to Mr. Gevas's injuries.

7

At summary judgment, Defendants have not produced any evidence that Director Baldwin took reasonable steps to correct the systemic problems in medical treatment that lead to breakdowns in care for Mr. Gevas. Even if they had, the question of whether or not such steps were reasonable is a question for the jury to decide. *Santiago v. Rabideau*, No. 15 C 1856, 2019 WL 1747361 at *13 (N.D. Ill. April 18, 2019) (collecting cases for proposition that jury should determine whether steps taken by prison officials to address systemic prison conditions were reasonable).

### b. Warden Pfister Was Aware of Systematic Problems with Inadequate Medical Treatment at Stateville Correctional Center

As with Director Baldwin, there is sufficient evidence from which a jury can infer that Warden Pfister knew of systemic problems with the medical care being provided by the Department's vendor, Wexford Health Sources, at Stateville Correctional Center specifically. Defendant Pfister was a warden in the IDOC at the time the Shansky Report came out in December 2014. PSOF ¶ 50. He became warden of Stateville Correctional Center in November 2015 and testified that he never picked up the Shansky Report to find out what it said about his new facility. PSOF ¶ 50; ISOF ¶ 2. Warden Pfister also claims he never even spoke to the facility's Medical Director, Dr. Obaisi, nor did he investigate the allegations brought in numerous lawsuits against Dr. Obaisi. PSOF ¶ 49.

Defendant Pfister attempts to bury his head in the sand and shield himself from liability by stating he never read the Shanksy Report, never spoke with the Medical Director, Doctor Obaisi, and delegated away his responsibility to review prisoner grievances, but far from absolving him of liability, a jury could conclude that each one of these actions demonstrates deliberate indifference. *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) ("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent.") (*citing United States*

8

*v. Giovannetti,* 919 F.2d 1223, 1226–29 (7th Cir.1990)). As the Seventh Circuit recognized in *McGill*, "[b]eing an ostrich involves a level of knowledge sufficient for conviction of crimes requiring specific intent," and so it is also "sufficient for liability under the Eighth Amendment's subjective standard." 944 F.2d at 351.

### III. Director Baldwin and Warden Pfister Cannot Delegate Away Their Responsibilities Through the Grievance System

Warden Pfister and Director Baldwin attempt to evade liability by arguing that they did not personally review Mr. Gevas's grievances and instead delegated review of such grievances to a designee. Under the Illinois Administrative Code, it is the responsibility of the Chief Administrative Officer—that is, the Warden—to review grievances. 20 Ill. Admin. Code 504.802, 504.830. And, under the Illinois Administrative Code, "no individual may routinely perform the Warden's duties, [although] a Warden may designate another person to perform his or her duties 'during periods of his or her temporary absence or in an emergency.'" *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 991–92 (N.D. Ill. 2012) (citing, 20 Ill. Admin. Code § 504.805(b)). Similarly, once a grievance has been responded to at the facility level, a prisoner may appeal the decision to the Administrative Review Board, which is appointed by the Director. 20 Ill. Admin. Code. 504.850(a), (b). Following the ARB's decision, "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance…" and "[t]he offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code. 504.850(e).

Neither the Director nor Warden Pfister can simply delegate away their responsibilities to review inmate grievances and then bury their heads in the sand, avoiding their responsibilities to resolve systemic problems that pose a serious risk of harm to prisoners in their custody. *See Thomas v. Wexford Health Servs., Inc.*, 414 F. Supp. 3d 1154, 1163 (N.D. Ill. 2019) ("[]Pfister cannot wholly insulate himself from personal involvement in Thomas's alleged

9

constitutional deprivation by delegating "much of the review of medical grievances to administrative assistants" and claiming he was not put on notice by the emergency grievances sent to his office."); *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 991–92 (N.D. Ill. 2012) ("The court does not believe that [the warden] can use the fact that he delegated much of the review of medical grievances to administrative assistants to insulate himself from liability for problems of which the grievances would have put him on notice.").

Defendants' argument was recently rejected by another court in this district in *Snow*, another medical deliberate indifference case bought by a prisoner from Stateville. There, both Warden Nicholson and Warden Pfister argued that they had no personal recollection of the prisoner, had delegated review of his grievances to their designees, and had no personal medical training so were not directly involved in the patient's treatment. *Snow v. Obaisi,* No. 1:17 CV 4015, 2021 WL 4439421, at *6 (N.D. Ill. Sept. 28, 2021). The court concluded that the wardens could not "simply use their proxies to avoid personal liability," and pointed out that "courts in this district have emphasized that although the warden may delegate the responsibility to review inmate grievances to others who sign his name for him, the buck still stops at the warden." *Snow v. Obaisi,* No. 1:17 CV 4015, 2021 WL 4439421, at *8 (N.D. Ill. Sept. 28, 2021) (*citing Drapes v. Hardy*, No. 14 C 9850, 2019 WL 1425733, at *6 (N.D. Ill. Mar. 29, 2019); (*Birch v. Jones*, No. 02 CV 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004); *Dixon v. Brown*, No. 3:16-CV-01222-GCS, 2021 WL 1171657, at *8 (S.D. Ill. Mar. 29, 2021) ("By delegating the responsibility to review grievances, a warden may effectively consent to and approve of how those grievances are handled."). The court similarly rejected the argument that the wardens were merely deferring to the medical judgment of professionals as unsupported by any evidence.

Defendants' brief ignores the administrative code and the applicable caselaw. Instead, Defendants cite to *Burks v. Raemisch*, a case which has no application here and, indeed, contradicts their argument. 555 F.3d 592, 595-596 (7th Cir. 2009). That case does not answer the question of whether the warden or director can be held liable for deliberate indifference to issues that are brought to their attention through the grievance process. Rather, what the *Burks* decision demonstrates is the impossible Catch-22 that Warden Pfister and Director Baldwin have crafted to avoid liability—they argue they cannot be liable because they do not personally read the grievance, and then the designee who *does* read the grievance cannot be liable because they lack the authority to do anything about the problem.

**Conclusion**

Given the disputes of fact that remain in this case, Defendants have not met their burden to demonstrate that they are entitled to judgment as a matter of law. The IDOC Defendants' motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,
/s/ Samantha Reed

Harold Hirshman
Samantha R. Reed
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Harold.Hirshman@dentons.com
Samantha@equipforequality.org

11

## CERTIFICATE OF SERVICE

      I, Samantha R. Reed, an attorney, hereby certify that on October 25, 2021, I caused a copy of the foregoing document to be served on all counsel of record via the CM/ECF system.

      /s/ Samantha R. Reed