**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DAVID C. GEVAS, )
     )
         Plaintiff, )     Case No.: 16-cv-10599
     )
         v. )     Honorable Judge John Z. Lee
     )     Hon. Magistrate Judge Sunil R. Harjani
SALEH OBAISI, *et al.*, )
     )
         Defendants. )

## TABLE OF CONTENTS

Page

MOTION FOR SUMMARY JUDGMENT .................................................1

FACTUAL BACKGROUND .................................................................1

ARGUMENT ..................................................................................4

1.  Motion to Strike Several of Defendants' Factual Statements and Arguments as
    Relying on Impermissible Hearsay and Requiring Expert Medical Evidence..................5

2.  Defendants are Not Entitled to Summary Judgment on Plaintiff's Claims Against
    Defendant Obaisi ........................................................................6

    a.  Mr. Gevas's Eighth Amendment Claims .............................................6

        i.  A Jury Could Conclude that Dr. Obaisi was Deliberately
            Indifferent When He Failed to Monitor Mr. Gevas's Pulmonary
            Nodule, Leading to Delayed Diagnosis of Lymphoma .............................7

        ii. A Jury Could Conclude that Dr. Obaisi Was Deliberately
            Indifferent to Mr. Gevas's Sleep Apnea ....................................11

        iii. A Jury Could Conclude that Dr. Obaisi Was Deliberately
             Indifferent to Mr. Gevas's Atrial Fibrillation .........................13

    b.  A Jury Could Find for Plaintiff on his State Law Claims Against Dr.
        Obaisi ...............................................................................14

3.  Defendants are Not Entitled to Summary Judgment on Plaintiff's Claims Against
    Wexford Health Sources ................................................................15

    a.  The Evidence Creates a Triable Issue as to Plaintiff's Eighth Amendment
        Claim Against Wexford ..............................................................15

        i.  Wexford's Medical Recordkeeping Was Inadequate .............................16

        ii. The Collegial Review Process Delays and/or Denies Adequate
            Care ..................................................................................19

        iii. Wexford's Policy or Practice of Reviewing the Medical Director's
             Qualifications and Performance .........................................21

        iv. Wexford's Medical Staffing is Inadequate .................................22

    b.  Wexford is Not Entitled to Summary Judgment on Plaintiff's Institutional
        Negligence Claim....................................................................22

4.     The Availability of Punitive Damages is Not an Issue for Summary Judgment ..............23

5.     Defendants' Frivolous and Premature Motion for Summary Judgment Should be Denied with Prejudice.....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advincula v. United Blood Servs.*,
   176 Ill.2d 1 (1996) ................................................................................................23

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................................................................4

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ...............................................................................................6

*Flournoy v. Est. of Obaisi*,
   No. 17 CV 7994, 2020 WL 5593284 (N.D. Ill. Sept. 18, 2020)................ 18, 19, 20

*Goodloe v. Sood*,
   947 F.3d 1026 (7th Cir. 2020) ...........................................................................12

*Hildreth v. Butler*,
   960 F.3d 420 (7th Cir. 2020) .............................................................................15

*J.K.J. v. Polk Cty.*,
   960 F.3d 367 (7th Cir. 2020) .............................................................................15

*Johnson v. Est. of Obaisi*,
   No. 14-CV-10117, 2019 WL 4674587 (N.D. Ill. Sept. 25, 2019) ...........................8

*Jones v. Chicago HMO Ltd. of Illinois*,
   191 Ill. 2d 278 (2000).........................................................................................23

*Littler v. Martinez*,
   No. 216CV00472JMSDLP, 2019 WL 1043256 (S.D. Ind. Mar. 5, 2019)............24

*Malin v. Hospira, Inc.*,
   762 F.3d 552 (7th Cir. 2014) .............................................................................24

*McDonald v. Obaisi*,
   No. 16 C 5417, 2021 WL 3910754 (N.D. Ill. Sept. 1, 2021) ...............................12

*McGill v. Duckworth*,
   944 F.2d 344 (7th Cir. 1991) .............................................................................21

*Monell v. NYC Soc. Serv.*,
   436 U.S. 658 (1978) ......................................................................................15, 18

*Morisch v. United States*,
653 F.3d 522 (7th Cir. 2011) ...........................................................14

*Petties v. Carter*,
836 F.3d 722 (7th Cir. 2016) ...................................................6, 7, 8

*Rowe v. Gibson*,
798 F.3d 622 (7th Cir. 2015) ......................................................5, 6

*Shields v. Illinois Dep't of Corr.*,
746 F.3d 782 (7th Cir. 2014) ...........................................................15

*Smith v. Wade*,
461 U.S. 30 (1983) ...........................................................................23

*Stewart v. Wexford Health Sources, Inc.*,
No. 19-2994, 2021 WL 4486445 (7th Cir. Oct. 1, 2021) ..................4, 5

*United States v. Giovannetti*,
919 F.2d 1223 (7th Cir.1990) .........................................................21

*United States v. Jackson*,
208 F.3d 633 (7th Cir. 2000) .............................................................5

*Wellman v. Faulkner*,
715 F.2d 269 (7th Cir. 1983) ....................................................16, 18

*Whiting v. Wexford Health Sources, Inc.*,
839 F.3d 658 (7th Cir. 2016) .............................................................7

*Williams v. Erickson*,
962 F. Supp. 2d 1038 (N.D. Ill. 2013)...............................................23

*Woodward v. Corr. Med. Servs. of Ill., Inc.*,
368 F.3d 917 (7th Cir. 2004) ...............................................15, 23, 24

*Zaya v. Sood*,
836 F.3d 800 (7th Cir. 2016) .............................................................8

**Statutes**

42 United States Code
§ 1983 ..........................................................................................15, 24

735 Illinois Compiled Statutes
§ 5/2-622...........................................................................................1

**Rules and Regulations**

Federal Rule of Evidence

Rule 201 .................................................................................................................. 5, 6
Rule 801 ...................................................................................................................... 5
Rule 801(d) ............................................................................................................... 18
Rule 801(d)(2)(a) ..................................................................................................... 18

Federal Rules of Civil Procedure

Rule 56(a) ................................................................................................................... 4

## PLAINTIFF'S RESPONSE IN OPPOSITION TO WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Wexford Defendants (the estate of Dr. Saleh Obaisi and Wexford Health Sources) previously asked Plaintiff and this Court to postpone medical expert discovery until *after* the filing of dispositive motions. ECF No. 272. The parties agreed, and while Plaintiff has consulted with a medical expert for the purposes of filing an initial declaration supporting his state law claims as required under 735 ILCS 5/2-622, medical expert discovery has not yet taken place. Despite that, Wexford Defendants have now moved for summary judgment on Plaintiff's medical deliberate indifference and state law claims, citing as justification that Plaintiff has not proven that the medical standard of care has been violated. Defendants' request for summary judgment is premised on this Court abandoning settled summary judgment law and resolving myriad disputes of fact in Defendants' favor. The expert affidavit attached to Plaintiff's response demonstrates why a jury must decide the factual questions of whether Wexford and/or Dr. Obaisi violated the medical standard of care and the Eighth Amendment in failing to provide Mr. Gevas with adequate medical treatment. As shown below, Defendants' motion for summary judgment is frivolous and should be denied with prejudice.

## FACTUAL BACKGROUND

On May 6, 2014, Mr. Gevas was discharged from a week-long hospitalization at UIC Medical Center. PSOF ¶ 1; WSOF[1] ¶¶14-19. During his hospitalization, he was diagnosed with sleep apnea and atrial fibrillation, and a small pulmonary micronodule was found in his lung. PSOF ¶¶1, 2; WSOF ¶¶14-19. The discharge paperwork, received by both Dr. Obaisi and

---

[1] In this document and Plaintiff's additional statement of facts, Plaintiff will use "WSOF" to denote statements of fact made by Wexford Defendants and "ISOF" to denote statements of fact made by IDOC Defendants. Similarly, any Wexford exhibits referenced will be denoted as "WHS Ex." and any IDOC exhibits referenced will be denoted "IDOC Ex."

Wexford's corporate offices, instructed that Mr. Gevas should be prescribed baby aspirin and Metoprolol for atrial fibrillation and should follow up with his primary care physician within a few weeks. WSOF ¶19; PSOF ¶1. For the sleep apnea, the UIC physicians recommended a continuous positive airway pressure (CPAP) machine and suggested some other alternative treatments that could be tried as well. WSOF ¶19. For the pulmonary micronodule, the radiologist recommended it be monitored with another chest CT scan within 3-6 months, and again in another 9-12, to monitor for possibly malignancy. WSOF ¶15; PSOF ¶1.

Nearly two weeks after Mr. Gevas returned to Stateville, he had a post-discharge follow-up visit with Dr. Obaisi, who noted the diagnosis of obstructive sleep apnea but ignored both the atrial fibrillation and the pulmonary nodule. WSOF ¶21. The same day, Dr. Obaisi referred the CPAP machine recommendation to the collegial review process, and it was approved. WSOF ¶22. But there is no evidence that Dr. Obaisi actually ordered the CPAP machine once it was approved. As for the UIC specialist's recommendation for a follow-up chest CT scan, Dr. Obaisi ignored it entirely—he did not refer it to the collegial review process in May 2014, or ever.

In August 2015, Mr. Gevas began reporting more serious pain in his lower back and left leg. PSOF ¶12. While he had had back pain in the past, he reported that this pain was different— a throbbing, constant pain that was getting worse. *Id.* In December, Mr. Gevas was seen by an orthopedic specialist at UIC who recommended an x-ray of the lumbar spine, weight loss, and physical therapy, as well as a return to UIC for further examination. *Id.* ¶13. Dr. Obaisi and Dr. Ritz considered the recommendations in collegial review, and they determined that Mr. Gevas would receive follow-up on site at Stateville—including a weight loss regimen, physical therapy, a lumbar spine x-ray, and a return to collegial review—rather than returning to UIC. *Id.* ¶13, 15. While the collegial review note specifically assigns Dr. Obaisi to order the x-ray, there is no

evidence that he ever ordered it. *Id.* ¶13, 14. Months later, when Mr. Gevas's lymphoma was finally discovered, he had numerous lytic lesions in this same area. *Id.* ¶12.

On December 28, 2015, Mr. Gevas presented to the healthcare unit at Stateville with a heart rate of 111, a productive cough, burning chest pain, shortness of breath, and night sweats. WSOF ¶35. He was prescribed antibiotics and cough drops, but they did not improve his symptoms. WSOF ¶¶35-49. Mr. Gevas's respiratory symptoms continued over the next three months, and while he saw Dr. Obaisi at least seven times, not once did Dr. Obaisi order the chest CT scan that UIC had recommended more than a year and a half prior. *Id.*

In early January, Dr. Obaisi ordered a rib x-ray, which raised questions that were ignored, as it revealed that Mr. Gevas had somehow broken his seventh left rib without any explanation. WSOF ¶37; PSOF ¶17. Dr. Obaisi still did not order a CT scan or any other diagnostic testing to determine the cause of the broken rib or to see whether Mr. Gevas's respiratory symptoms were related to the previously discovered pulmonary nodule. On January 25, Dr. Obaisi administered steroid and antibiotic injections without noting any medical justification in Mr. Gevas's records. WSOF ¶40. Neither injection ameliorated his symptoms. PSOF ¶18.

In February 2015, Dr. Obaisi ordered a chest x-ray that once again did not reveal the cause of the symptoms. WSOF ¶43. At this point, someone did finally refer Mr. Gevas to Wexford's collegial review process for a chest CT scan—but it was denied in favor of an "alternative treatment plan" based on Dr. Obaisi's curious and unsupported report that Mr. Gevas's symptoms had improved on prednisone. *See* Pls' Resp. to WSOF ¶44; PSOF ¶21. In fact, Mr. Gevas's symptoms had not improved, and the visit during in which Defendants claim Mr. Gevas reported an improvement actually occurred one day *after* the collegial review denial. Pls' Resp. to WSOF ¶44; PSOF ¶21.

In early March, Mr. Gevas began reporting severe pain in his right shoulder, which Dr. Obaisi noted as tenderness in the scapula area, but still Dr. Obaisi did not order any diagnostic testing or CT scan. PSOF ¶¶ 23, 24. Finally, on March 31, 2016, after three long days of acute chest pain, Mr. Gevas was sent to an outside hospital. WSOF ¶¶48-49. Mr. Gevas was found to be in an acute episode of uncontrolled atrial fibrillation, and a CT angiogram revealed that his one pulmonary micronodule was now multiple pulmonary nodules, and that he had chest and adnominal lymphadenopathy and lytic lesions throughout his spine, pelvis, and ribs. WSOF ¶49; PSOF ¶26. This was later determined to be caused by Stage IV diffuse large B-cell lymphoma with multifocal bone disease in the spine, rib, and clavicle and extranodal disease (lung nodules). PSOF ¶29. The cancer had fractured his clavicle, and his bones were so fragile as a result of the lytic lesions that he was instructed to avoid heavy lifting and take precautions against falling. *Id.* ¶¶27, 28. As Defendants' internet research acknowledges, the cancer Mr. Gevas had was fast moving and needed to be treated quickly—something that could have been done if UIC's recommendations for follow-up CT scans had been followed rather than ignored.

## ARGUMENT

Summary judgment is only appropriate when the uncontested facts entitle the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). At summary judgment, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, No. 19-2994, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). The Court has "one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (*quoting Payne v. Pauley*, 337 F.3d 767, 770–71 (7th Cir. 2003)).

The Seventh Circuit recently admonished Wexford for its "loose allegiance to the requirement that, on summary judgment, facts should be taken in the light most favorable to the non-moving party." *Stewart v. Wexford Health Sources, Inc.,* No. 19-2994, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Unfortunately, the Wexford Defendants commit the same error in this case, as their motion asks this Court to grant summary judgment based on reading their self-selected facts in the light favorable to them and resolving all factual disputes in their favor. Wexford's motion for summary judgment simply repudiates all the rules of summary judgment.

**1.      Motion to Strike Several of Defendants' Factual Statements and Arguments as Relying on Impermissible Hearsay and Requiring Expert Medical Evidence**

In support of their motion for summary judgment, Defendants put forth web articles from the Leukemia Foundation, Cleveland Clinic, and the Mayo Clinic. (WHS Exs. 4, 5, 6, and 7). Defendants base several of their factual statements on this hearsay evidence (WSOF ¶6, 7, 8 and 9) and make several arguments for why summary judgment should be granted that amount to a lay person's interpretation of these articles as well as the medical records in this case.

The web articles are put forth for the truth of the matters asserted, have not been authenticated, and were not made by any witness who has or will testify in this case. This is the definition of hearsay evidence, and these articles and factual statements should be stricken. Fed. R. Evid. 801; *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (web postings that were not statements made by declarants testifying at trial and are being used to prove the truth of the matter asserted are hearsay).

Defendants drop a footnote justifying their hearsay evidence with the argument that courts may take judicial notice of certain facts. ECF No. 399 p. 2 fn 2. The standard for taking judicial notice of a fact is quite high and requires that the accuracy of those facts be "indisputable." *See Rowe v. Gibson*, 798 F.3d 622, 629 (7th Cir. 2015); Fed. R. Evid. 201.

5

In *Rowe,* the Seventh Circuit included a lengthy discussion of materials from websites such as the Mayo Clinic to illustrate that there had, in fact, been a dispute of fact in the district court, and the grant of summary judgment had been inappropriate. That case involved a pro se litigant who did not have access to a medical expert to refute Defendants' expert testimony and to support his layperson's experience that taking Zantac outside of a certain time period reduced its efficacy. *Id.* The Seventh Circuit noted that the websites of the manufacturer and the Mayo Clinic supported the pro se litigant's position, and that the district court should not have dismissed the claim given the dispute of material fact. In citing to these reputable websites, the Court was careful to explain that it was *not* taking "judicial notice" of those medical websites, nor could it under Rule of Evidence 201. Here, Wexford seeks to have this Court not only take judicial notice of facts contained in hearsay evidence, but to use that evidence to *extinguish* Plaintiff's claims, before expert discovery has even commenced—just the opposite of what the Seventh Circuit was doing in *Rowe*. Wexford is not only a sophisticated and represented litigant, but also a medical services corporation with virtually unlimited access to medical experts. There is simply no justification for Wexford's reliance on hearsay where expert testimony is mandated.

**2.    Defendants are Not Entitled to Summary Judgment on Plaintiff's Claims Against Defendant Obaisi**

       **a.    Mr. Gevas's Eighth Amendment Claims**

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter,* 836 F.3d 722, 727 (7th Cir. 2016), as amended (Aug. 25, 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To that end, courts preform a two-step analysis in determining when a prisoner's Eighth Amendment rights have been violated due to lack of medical treatment: 1) did the plaintiff suffer from an objectively serious medical condition, and

2) was the defendant deliberately indifferent to that condition. In this case, Defendants have not raised any argument that Plaintiff's conditions of sleep apnea, atrial fibrillation, and lymphoma are not objectively serious medical conditions, so here the analysis (as to both Dr. Obaisi and Wexford) is limited to whether the Defendants were deliberately indifferent.

A prison doctor may demonstrate deliberate indifference in a number of ways, including by continuing in a harmful course of conduct; making treatment decisions that constitute a substantial departure from accepted professional practice; failing to follow an existing protocol; persisting in a course of treatment known to be ineffective; or inexplicably delaying treatment which serves no penological interest. *See Petties v. Carter*, 836 F.3d 722, 729-30 (7th Cir. 2016). *See also Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 663 (7th Cir. 2016). The record evidence demonstrates that Dr. Obaisi was deliberately indifferent to serious risks to Mr. Gevas's health in nearly all of these ways.

> i.  **A Jury Could Conclude that Dr. Obaisi was Deliberately Indifferent When He Failed to Monitor Mr. Gevas's Pulmonary Nodule, Leading to Delayed Diagnosis of Lymphoma**

There is sufficient evidence for a jury to find that Dr. Obaisi knew of and disregarded known risks of harm to Mr. Gevas by failing to order follow-up chest CT scans to monitor the pulmonary micronodule that had been found by the UIC radiologist in April 2014. It is undisputed that Mr. Gevas was discharged to Stateville and to Dr. Obaisi's care with the recommendation that he receive a follow-up chest CT scan within 3-6 months, per the Fleischner Society Guidelines, and within another 9-12 months after that if stable. WSOF ¶15. And it is undisputed that Dr. Obaisi did not even note the pulmonary nodule finding in Mr. Gevas's medical records, let alone order the follow-up CT scans. WSOF ¶21. It is further undisputed that a year and a half later, when Mr. Gevas began experiencing serious and unexplainable symptoms of chest pain, productive cough with clear sputum, shortness of breath, night sweats and chills,

all of which were unresponsive to antibiotics, nebulizer treatments, and pain medications, Dr. Obaisi *still* did not order a chest CT scan. WSOF ¶¶35-48. Instead, he let Mr. Gevas languish with these symptoms for several months, when he knew that Mr. Gevas had a history of a micronodule in his lung that had never been followed up on.

The evidence shows that Dr. Obaisi's reckless indifference to UIC's recommendations and Mr. Gevas's symptoms delayed the diagnosis of non-Hodgkins lymphoma until it had spread throughout his body, resulting in Stage IV metastic disease, a pathological fracture in his collarbone, and numerous lytic lesions (weak spots) in his spine, ribs, and pelvis. PSOF ¶26, 27, 29. The stage IV lymphoma required more intensive chemotherapy treatment than if it had been caught earlier and caused Mr. Gevas unnecessary pain, suffering, and diminished life expectancy. *Id.* ¶31.

This is not, as Defendants would have it, a case about a disagreement between a prisoner and his doctor about the appropriate course of treatment. A jury could conclude from the undisputed evidence alone that Dr. Obaisi's failure to follow the UIC radiologist's recommendation to order a follow-up chest CT scan within 3-6 months was deliberate indifference. *See Johnson v. Est. of Obaisi,* No. 14-CV-10117, 2019 WL 4674587, at *10 (N.D. Ill. Sept. 25, 2019) (denying summary judgment to Dr. Obaisi because a jury could reasonably conclude that his failure to follow the recommendations of UIC ophthalmologist was deliberate indifference); *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist."); *Petties v. Carter*, 836 F.3d 722, 729 (explaining that doctor refusing to take instructions from specialist can indicate that they crossed the threshold between an acceptable difference of opinion and an action reflecting sub-minimal competence). But not only that, Plaintiff has brought expert

medical evidence to demonstrate that the Fleischner Society Guidelines represent the internationally recognized standard of care, and Dr. Obaisi's decision to ignore those recommendations was so far afield of the medical standard of care that it amounts to deliberate indifference. PSOF ¶71.

Moreover, Defendants have not presented any evidence to support their contention that Dr. Obaisi was exercising his clinical judgment when he failed to order follow-up CT scans of Mr. Gevas's chest following UIC's discovery of a potentially malignant micronodule. Indeed, there are no notes anywhere in Mr. Gevas's medical record, from May 2014 or at any other period, that indicate that Dr. Obaisi made any reasoned justification for deviating from UIC's or the Fleischner society's recommendations. PSOF ¶5 (citing WHS Ex. 9, at 15). The only time a chest CT scan was considered for Mr. Gevas—after he had already suffered several weeks of intense respiratory symptoms including coughing, shortness of breath, and chest pain without explanation—the recommendation was rejected in Wexford's collegial review process by Dr. Obaisi and a doctor from Wexford's corporate office, Dr. Ritz. *Id.* ¶¶16, 21.

Defendants' arguments in defense of Dr. Obaisi's actions must be taken with caution, as they are not based on any medical evidence or really any evidence at all. For example, there is simply no evidence to support the suggestion that the only risk posed by the pulmonary nodule found in Mr. Gevas's lungs in May 2014 was potential lung cancer, as opposed to any other cancer or disease. ECF No. 400 at 7. Contrary to Defendants' unsupported argument, the evidence shows that Mr. Gevas's pulmonary nodules were caused by lymphoma. PSOF ¶¶26-28. Indeed, by the time Mr. Gevas's lymphoma was diagnosed in April 2016, that single, small micronodule that had been found in May 2014 had multiplied into *multiple* pulmonary nodules. *Id.*; WSOF ¶49. It is patently absurd to suggest that it is permissible for a prison doctor to ignore

9

the medical standard of care for potential lung cancer and avoid liability for reckless disregard for human life simply because it was a different type of cancer that caused nodules in the lung.

Another example of Defendants deviating from the record evidence and making up facts is their argument that Mr. Gevas's symptoms improved with modalities intended to treat viral and bacterial infections. ECF No. 8. No laboratory tests were ordered to confirm that a virus or bacteria were the source of Mr. Gevas's symptoms, even when Mr. Gevas collected his own sputum sample, and Dr. Obaisi told him he would test it. PSOF ¶¶19, 20. Defendants' assertion that Dr. Obaisi's treatment modalities were "intended to treat viral and bacterial infections" is argument, not based on any evidence. And more importantly, the statement that they improved Mr. Gevas's symptoms is contradicted by the record. PSOF ¶18. Not only did Mr. Gevas's symptoms not improve, they grew progressively worse over the three-month period, from December 28, 2015, until he was transported to St. Joseph's on an emergency basis on March 31, 2016. WSOF 35-49. In fact, at an appointment with the nurse on February 2, 2016, after Mr. Gevas had received injections of a steroid and an antibiotic, he reported to the nurse that he felt *worse* than he had before. PSOF ¶18.

Yet another example of Defendants misstating the facts is Defense counsel's ludicrous assertion that "the causal relationship between orthopedic injuries and lymphoma is tenuous at best." ECF No. 400 at 7. There can be no reasonable dispute that Mr. Gevas's orthopedic injuries—including a broken rib and fractured clavicle—were caused by the lymphoma. As Wexford's own witness, Dr. Fisher, testified, the lytic lesions that were found throughout Mr. Gevas's ribs, spine, and pelvis are caused when cancer cells metastasize on the bone and replace bone tissue. PSOF ¶28. Dr. Fisher further testified that the x-ray conducted in January 2016 was insufficient to determine the cause of the broken rib, and that Dr. Obaisi should have

10

been talking with Mr. Gevas about possible causes for the break. *Id.* ¶17. He further testified that the lower back and leg pain that Mr. Gevas was experiencing in August 2015 was likely caused by the spreading cancer, as well as his broken rib. *Id.* ¶12. If nothing else, it is for a jury to decide whether Dr. Obaisi's decision not to order testing to determine the cause of the orthopedic injuries demonstrates deliberate indifference, especially in light of the concurrent symptoms of worsening chest pain, cough, shortness of breath and other physical problems.

### ii. A Jury Could Conclude that Dr. Obaisi Was Deliberately Indifferent to Mr. Gevas's Sleep Apnea

During a hospitalization at UIC in late April and early May 2014, Mr. Gevas underwent a sleep study wherein he was diagnosed with sleep apnea. WSOF ¶20. The discharge instructions noted that his sleep apnea "should be treated with a nasal continuous positive airway pressure (CPAP/AutoPap)" or, alternatively, mandibular advancement split, referral to an ENT surgeon, weight loss, or behavioral therapy could all be considered. *Id.*

Defendants argue that Dr. Obaisi had exercised his clinical judgment in disagreeing with UIC's recommendation to prescribe a CPAP machine, but there is simply no evidence that Dr. Obaisi had chosen to pursue some other course of treatment for Mr. Gevas's sleep apnea. Quite to the contrary, and as Defendants themselves point out, the evidence demonstrates that Dr. Obaisi and Dr. Garcia considered the CPAP machine recommendation in the collegial review process on May 19, 2014, *and approved it*. WSOF ¶ 22. Dr. Obaisi told Mr. Gevas he had ordered the CPAP machine that same day and during several follow-up appointments. PSOF ¶6. Yet Mr. Gevas did not receive the CPAP machine until August 2017—more than three *years* after UIC recommended it and Wexford approved it in the collegial review process, depriving Mr. Gevas of proper sleep and putting him at risk of illness and death. *Id.* ¶¶7, 8, 32.

11

A jury could reasonably conclude that Dr. Obaisi was deliberately indifferent given that Dr. Obaisi had approved Mr. Gevas's CPAP machine in collegial review (showing that he knew the CPAP was necessary), but simply failed to follow through (despite Mr. Gevas's repeated requests). *See McDonald v. Obaisi*, No. 16 C 5417, 2021 WL 3910754, at *9 (N.D. Ill. Sept. 1, 2021) ("a question exists as to whether Dr. Obaisi exercised any medical judgment when failing to follow through on the MRI he had marked as urgent in January 2013 when he let the referral fall by the wayside, did not formulate an alternative treatment plan, and waited another two years before reviving that request.) (*citing Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) ("[W]hen a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong.")).

Defendants put forth the nonsensical argument that it is Mr. Gevas's own fault that three years elapsed between the May 2014 approval of the CPAP and its delivery to Mr. Gevas in August 2017—because he had refused a sleep study in 2013. ECF No. 400 at 6; WSOF ¶12. First, a jury could reasonably conclude based on Mr. Gevas's testimony that he did not refuse the sleep study at all—what he refused was staying in an unhygienic cell that was cross contaminated with another inmates feces, and Defendants failed to reschedule his sleep study. PSOF ¶10. More importantly, a jury could easily conclude that Mr. Gevas's refusal of a sleep study in 2013 had no bearing whatsoever on Defendants' three-year delay in providing the CPAP that followed the May 2014 sleep study and diagnosis. At the very least, there is a dispute of fact about whether Mr. Gevas's purported refusal of the sleep study in 2013 contributed to Defendants' 3+-year delay in providing the CPAP machine, and Defendants cannot meet their burden to prove they are entitled to summary judgment on this claim.

Finally, there is evidence from which a jury could conclude that untreated obstructive sleep apnea can lead to complications including abnormal heart rhythms, especially in patients with pre-existing heart conditions such as atrial fibrillation, which can lead to sudden death. PSOF ¶32. Dr. Obaisi's failure to ensure that Mr. Gevas received treatment for his sleep apnea for over three years was even more dangerous and less reasonable given Mr. Gevas's diagnosis of atrial fibrillation.

### iii. A Jury Could Conclude that Dr. Obaisi Was Deliberately Indifferent to Mr. Gevas's Atrial Fibrillation

Defendants' arguments regarding Mr. Gevas's atrial fibrillation rely on a confluence of hearsay evidence, factual inaccuracies, and outright contradictions. First, Defendants' own web research revealed that a normal heart rate range is 60 to 100 beats per minute, while a heart rate in atrial fibrillation may range from 100 to 175. WSOF ¶8. Yet Defendants note several dates during which Mr. Gevas's pulse rate was in the abnormal range—on December 9, 2015, his pulse rate was 105 (WSOF ¶ 34); on December 28th, when he first presented with symptoms of chest pain and cough, it was 111 (WSOF ¶ 35); on January 14, 2016, it was 114 (WSOF ¶ 39); and on February 17, 2016, it was 107 (WSOF ¶44)—and Dr. Obaisi did not send Mr. Gevas to the emergency room or conduct any emergent follow-up on any of these occasions. For reference, on March 31, 2016, the day Mr. Gevas was finally sent out to St. Joseph's hospital after 3 days of worsening chest pain and was found to be in atrial fibrillation, his pulse rate was 115. (WSOF ¶¶ 48, 49.) Based on this evidence alone, a jury could reasonably conclude that Dr. Obaisi was deliberately indifferent to Mr. Gevas's uncontrolled atrial fibrillation at minimum during the three-month period from December 28, 2015, through March 31, 2016, leading to ongoing pain and suffering that did not serve any penological purpose.

Defendants attempt to argue that there is evidence that Dr. Obaisi took steps to address these atrial fibrillation symptoms, but their citations to the record are misleading and incorrect. For example, Defendants state that on January 5, 2016, Dr. Obaisi increased Plaintiff's dosage of Metoprolol from 100 mg to 600 mg, but there is strong evidence to suggest that this is a transcription error, and no such increase in medication actually occurred. For one, Mr. Gevas did not even present with an abnormal pulse rate on January 5, 2016 (it was 70), but *did* present with pain, for which Dr. Obaisi prescribed Motrin. *See* Pls.' Resp. To WSOF ¶36. Mr. Gevas had consistently been prescribed 600 mg Motrin, and Mr. Gevas testifies that he was prescribed 600 mg of Motrin, *not* Metoprolol, during this appointment. *See id.*

Defendants attempt to argue that there is evidence that Dr. Obaisi took steps to address these atrial fibrillation symptoms, but their citations to the record are misleading and incorrect. For example, Defendants state that on January 5, 2016, Dr. Obaisi increased Plaintiff's dosage of Metoprolol from 100 mg to 600 mg, but this is a transcription error in the medical note. In fact, the prescription order from the same date indicates that Dr. Obaisi prescribed a 100mg dosage of Metoprolol. *See* Pls.' Resp. To WSOF ¶36. Indeed, Mr. Gevas did not even present with an abnormal pulse rate on January 5, 2016 (it was 70), but *did* present with pain, for which Dr. Obaisi prescribed 600 mg of *Motrin. See id.*

### b.     A Jury Could Find for Plaintiff on his State Law Claims Against Dr. Obaisi

Plaintiff also brings state law medical malpractice claims against Dr. Obaisi. To succeed on those claims, Mr. Gevas must show "(1) the proper standard of care against which the defendant's conduct is measured; (2) an unskilled or negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the defendants want of skill or care." *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011).

Dr. Finander's affidavit provides evidence from which a jury could conclude that Dr. Obaisi failed to follow the standard of care in many aspects of his treatment of Mr. Gevas. Based on that affidavit and the other evidence described above, a jury could reasonably conclude that Dr. Obaisi's failure to follow the standard of care regarding the pulmonary nodule, sleep apnea, and atrial fibrillation resulted in years of interrupted sleep and related complications, many months of pain and suffering with acute respiratory symptoms, and delayed diagnosis of lymphoma requiring more intensive chemotherapy treatment and resulting in numerous orthopedic injuries, lytic lesions, and diminished life expectancy. PSOF ¶¶31, 69, 70, 71.

**3.** **Defendants are Not Entitled to Summary Judgment on Plaintiff's Claims Against Wexford Health Sources**

    **a.** **The Evidence Creates a Triable Issue as to Plaintiff's Eighth Amendment Claim Against Wexford**

When a plaintiff sues a private corporation acting under state law for deliberate indifference under § 1983, the framework of *Monell v. NYC Soc. Serv.*, 436 U.S. 658 (1978) applies. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). A plaintiff must present evidence that would allow a reasonable jury to conclude that his injury was caused either by "a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (*citing Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)). As with deliberate indifference against an individual, a plaintiff must show that policymakers knew and failed to correct the practice, *Hildreth*, 960 F.3d at 426, and that Wexford's conduct was the "moving force" behind his injury. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc).

"[A]s a practical matter, 'deliberate indifference' can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' or it can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir. 1983). Here, Wexford has several practices, customs, or patterns of bad acts that demonstrate deliberate indifference, including:

- inadequate medical record keeping (PSOF ¶¶43, 46, 61, 66)

- failure to establish a procedure to track patients who receive offsite services and require additional follow-up (PSOF ¶¶35)

- using a collegial review process that failed to consider all relevant patient records and failing to maintain adequate records of the collegial review process itself including the process that was undergone and the reasons clinical determinations were made (PSOF ¶¶60, 61)

- hiring an underqualified physician to act as Medical Director and failure to appropriately assess his performance (PSOF ¶ 67)

- providing insufficient medical staffing at Stateville Correctional Center (PSOF ¶45, 38, 39)

### i. Wexford's Medical Recordkeeping Was Inadequate

There is ample evidence for a jury to conclude that Wexford's practice of keeping medical records was inadequate, including deliberate failure to maintain appropriate records of offsite medical services and to track necessary follow-up after offsite services. Even after Dr. Shansky identified "breakdowns in nearly every area" of identifying patient need for off-site services and tracking necessary follow-up, Wexford still did not develop a log or other procedure for providers track offsite services and needed follow-up. PSOF ¶¶35, 36.[2] This meant that, when

---

[2] Defendants argue that the Lippert reports are impermissible hearsay, but the Shansky Report is put forth here to show that Wexford was on notice of these systemic problems, not for the truth of the matter asserted.

Mr. Gevas returned to Stateville from his hospitalization at UIC in May 2014, there was no effective mechanism for the facility providers to track the diagnoses made to ensure that proper follow-up happened, including the provision of the CPAP machine or the chest CT scans. There is no evidence that even a simple spreadsheet or tickler system was set up to make sure that the monitoring of a potentially malignant nodule occurred, even in the face of warnings from the Lippert expert in the Shansky Report. PSOF ¶56. This demonstrates deliberate indifference.

While there is some finger-pointing among the IDOC and Wexford Defendants about who had responsibility for the medical records, ultimately, under the contract between Wexford and IDOC, it was the responsibility of Wexford's providers to make entries into the medical record and to manage patient care. PSOF ¶¶62-66. It was the responsibility of Wexford providers to make sure that medical history was documented, and that documents such as discharge instructions and recommendations from outside medical appointments were documented in the patient's medical record. *Id.* ¶64. It was also the responsibility of Wexford providers to assess the findings, diagnoses, and recommendations made by outside providers and to incorporate them into the patient's treatment plan. *Id.* ¶64, 65. And it was the responsibility of Wexford to ensure that treatment plans were developed for patients who required ongoing care, and that those treatment plans specify in writing what was to take place and who was responsible for making it happen. *Id.* ¶65, 66. But Wexford did not create appropriate policies or procedures to ensure its providers kept adequate medical records or formulated appropriate treatment plans. *Id.*

Dr. Obaisi even admitted to the Lippert monitoring team that he had asked Wexford for additional time to see patients because the medical documentation was so poor that it was difficult to determine what the patient's problems were is also evidence of the poor quality of

17

record-keeping that was standard practice by Wexford (and known to Wexford). PSOF ¶39.[3] And the evidence shows that Wexford does not mandate any standardized way of communicating a patient's treatment plan among providers. *Id.* ¶66. Wexford's witnesses testified that it was up to the discretion of the physician what to include in a medical note, even while acknowledging that the whole purpose of the medical record is to communicate among treatment providers and facilitate continuity of care of the patient over time. *Id.*

This is similar to the *Monell* claim brought against Wexford in *Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020). There, the plaintiff argued that Wexford had a custom or practice of prematurely discontinuing prescriptions. As evidence of this practice, he showed at least three different instances where it happened to him, coupled with an admission from Dr. Obaisi himself that it was Wexford's practice to discontinue a prescription after three or four months, even if it was written for longer. *Id.* at *3.

Here, Dr. Obaisi similarly admitted to the Lippert team that the medical documentation was too poor to determine what a patient needed, and Mr. Gevas's own medical records demonstrate Wexford's poor recordkeeping and failure to track his need for ongoing follow-up. PSOF ¶5, 13-14, 19-20. In addition to the failure to record or follow up on the need for chest CT scans and the CPAP machine, (*id.* ¶¶5, 19-20), Wexford providers failed to appropriately follow-up with recommendations of UIC orthopedics in December 2015, *id.* ¶¶13-14.

A jury could reasonably conclude from this evidence that Wexford's practice or custom of maintaining medical records was inadequate to provide appropriate medical care, including that they failed to log or track offsite treatment and required follow-up. A jury could further conclude that Wexford's failure to promulgate or enforce adequate medical record procedures

---

[3] Dr. Obaisi's comments quoted in the Puisis Report are not hearsay because they are party admissions. See Fed. Rule Evidence 801(d)(2)(a) and (d).

18

directly led to the delayed diagnosis of Mr. Gevas's stage IV diffuse large B cell lymphoma as well as the three-year delay in providing Mr. Gevas a CPAP machine for his sleep apnea.

### ii. The Collegial Review Process Delays and/or Denies Adequate Care

Wexford's collegial review process is another policy or practice that demonstrates deliberate indifference to adequate patient care and led to delayed diagnosis of Mr. Gevas's lymphoma. All non-emergency referrals for offsite services must go through the collegial review process. WSOF ¶10. This includes the follow-up chest CT scans that UIC determined that Mr. Gevas needed. PSOF ¶1. In order for a referral for offsite services to be approved, the facility Medical Director and a utilization management physician from Wexford's corporate office must meet and discuss the referral and agree as to next steps. PSOF ¶60. But, during this process, the doctors considering the referral do not have the complete medical record in front of them. *Id.* ¶60, 61. Frequently, they do not even have the medical documentation relevant to the referral. *Id.* This raises questions about how the collegial review process could accomplish its purported goal of reviewing the clinical necessity of a given referral.

A jury could infer from this evidence that the collegial review process actually serves a different purpose—cutting costs rather than providing care. At the very least, a jury could conclude that Wexford's methods of conducting collegial review are deliberately indifferent because the physicians make clinical decisions knowing that they do not have all relevant information in front of them. Mr. Gevas's records demonstrate exactly why this practice is a reckless way to handle patient care. On February 16, 2016, after two months of ongoing, unexplainable chest pain, cough, night sweats, and shortness of breath, Mr. Gevas was referred for a chest CT scan, but the reviewing physicians (Dr. Obaisi and Dr. Ritz, from Wexford's corporate office in Pennsylvania) apparently did not look at Mr. Gevas's medical history, as the notes from the review say nothing about UIC's prior finding of a pulmonary micronodule or their

19

recommendations that at least two chest CT scans should already have been done by that point. PSOF ¶1, 21. Instead, the chest CT scan was denied, based at least in part on a factually inaccurate report by Dr. Obaisi that Gevas's symptoms had improved on prednisone. *Id.* ¶21.

Another issue with Wexford's collegial review process is that the medical record keeping from the reviews is often insufficient to understand what medical documentation was reviewed or what clinical judgments were made. PSOF ¶61, 62. For example, when Mr. Gevas's referral for a chest CT scan was denied in favor of an "alternative treatment plan," the notes from that decision do not explain what the alternative treatment plan is, or why a purported improvement of respiratory symptoms on prednisone would obviate the need for a chest CT scan. *Id.* ¶21. A similar mystery is presented by Mr. Gevas's orthopedics referral from UIC in December 2015. Mr. Gevas had gone to UIC orthopedics for lower back pain (which could have been related to the cancer, as numerous lytic lesions were later discovered in the same area). *Id.* ¶12. UIC orthopedics asked for a follow-up visit with Gevas and recommended a lumbar spine x-ray. *Id.* ¶13. The collegial review note reads that an "alternative treatment plan" would be pursued, and Dr. Obaisi's note in Gevas's file reads that the referral was denied, but the collegial review note also reads that Dr. Obaisi would send a completed x-ray of Gevas's lumbar spine to UIC. *Id.* But it is unclear from the record whether the x-ray was ordered or, if it was, whether it was ever sent to UIC. *Id.* 14. These multiple instances demonstrate a pattern of inadequate recordkeeping that makes it impossible for other clinical providers to understand what was decided in collegial review and why. This violates Wexford's obligations under its contract with IDOC and impedes continuity of care. *Id.* ¶¶63-66.

Wexford was on notice at least as of December 2014 that the collegial review process was responsible for delaying necessary offsite services at Stateville Correctional Center. PSOF

¶37. For Mr. Gevas, the denial of the chest CT scan in February 2016 led to several additional weeks of pain and suffering from lymphoma which would have been caught and treated earlier if his complete medical records were consulted in collegial review.  *Id.* ¶¶22-26.

### iii. Wexford's Policy or Practice of Reviewing the Medical Director's Qualifications and Performance

There is also evidence from which a jury could conclude that Dr. Obaisi was not qualified to work as a primary care physician and that Wexford either knew that Dr. Obaisi's performance presented a risk to patients at Stateville or that Wexford turned a blind eye to his inadequacy by failing to properly review his performance. *See McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) ("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent.") (*citing United States v. Giovannetti,* 919 F.2d 1223, 1226–29 (7th Cir.1990)). As the Seventh Circuit recognized in *McGill*, "[b]eing an ostrich involves a level of knowledge sufficient for conviction of crimes requiring specific intent," and so it is also "sufficient for liability under the Eighth Amendment's subjective standard." 944 F.2d at 351.

First, Wexford knew that Dr. Obaisi had no expertise in internal or family medicine, meaning that he was not appropriately trained to work even as a primary care physician, let alone as a Medical Director. PSOF ¶¶67, 68. Moreover, Wexford was on notice that Dr. Obaisi's lack of appropriate training translated into poor patient care because they knew that he had been sued numerous times over his failure to provide adequate care. *Id.* ¶68. A search of the Northern District PACER system conducted on October 20, 2021, revealed more than 425 lawsuits against Dr. Obaisi for care rendered while employed by Wexford to work in the Illinois Department of Corrections. Indeed, Dr. Obaisi himself had admitted in the 2016-2017 CQI Report that his time was divided between litigation duties and patient care. *Id.* ¶¶38, 40.

As relevant to the scheduling and follow-up of offsite appointments, Wexford knew that Dr. Obaisi was not performing well in this area. PSOF ¶74. As medical director, it was Dr. Obaisi's responsibility to make sure appointments and follow-ups with UIC were scheduled. PSOF ¶69.

To the extent Wexford will argue that they did not know that Dr. Obaisi was providing inadequate medical care, it was their job to review the performance of their physicians and ensure quality. PSOF ¶67. A jury could find that Wexford's failure to properly assess the performance of its physicians (including failing to investigate the numerous complaints and lawsuits against Dr. Obaisi) amounts to turning a blind eye to the substandard care being provided by Dr. Obaisi.

### iv. Wexford's Medical Staffing is Inadequate

Yet another Wexford practice or custom that perpetuates inadequate medical treatment at Stateville is insufficient medical staffing. Once again, the Lippert monitor identified insufficient staffing and a leadership vacuum as a serious issue at Stateville Correctional Center in December 2014. PSOF ¶34, 57. Yet Wexford failed to address this issue in any way, as evidenced by Dr. Obaisi's admission to the Lippert Monitoring Team in 2018 that there still were not enough staff at Stateville, and that he believed an additional physician was needed. *Id.* ¶¶38, 39.

A jury could conclude from Wexford's failure to provide sufficient medical staff at Stateville Correctional Center that the corporation was deliberately indifferent to the risk of harm posed to patients there.

### b. Wexford is Not Entitled to Summary Judgment on Plaintiff's Institutional Negligence Claim

Wexford does not develop its argument that it is entitled to summary judgment on Plaintiff's state law institutional negligence or even cite the applicable legal standard. ECF No.

400 at 13. They argue that Plaintiff has not shown that his inadequate care or injuries were caused by "anything other than the individual decisions or negligence on the part of the Stateville medical staff," suggesting an acknowledgement that Dr. Obaisi's conduct was, at least, negligent. But under Illinois law, Wexford has administrative and managerial duty to review and supervise the treatment of its patients. *See Williams v. Erickson*, 962 F. Supp. 2d 1038, 1044 (N.D. Ill. 2013) (*citing Advincula v. United Blood Servs.,* 176 Ill.2d 1, 15 (1996)). That includes its responsibility to hire qualified physicians and to supervise their performance to ensure that they are providing appropriate care.

In short, based on the same evidence described above with regards to deliberate indifference, Mr. Gevas has created a triable issue of fact as to whether Wexford acted reasonably with regards to its medical recordkeeping, its hiring and review of Dr. Obaisi, its collegial review process, and its staffing levels at Stateville Correctional Center. *See Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 293 (2000).

**4.    The Availability of Punitive Damages is Not an Issue for Summary Judgment**

Plaintiff concedes that punitive damages are not recoverable against the estate of a deceased Defendant, and is no longer pursuing punitive damages against Defendant Obaisi. However, to the extent that Defendants also seek summary judgment on the question of whether punitive damages are recoverable against Wexford for its conduct in this matter, that issue is a question for the jury and is not appropriate for summary judgment.

For all the reasons that summary judgment is not appropriate on Plaintiff's deliberate indifference claim against Wexford, it also is not appropriate on the question of whether or not punitive damages should be awarded. Punitive damages are appropriate where the defendant had a reckless or callous disregard to the federally protected rights of others. *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) (*citing Smith v. Wade,* 461 U.S.

30, 35 (1983)). "This is the **same standard** as for § 1983 liability" because "both require a determination that the defendants acted with deliberate indifference or reckless disregard ..." *Woodward,* 368 F.3d at 930 (emphasis added) (internal citations omitted).

5.      **Defendants' Frivolous and Premature Motion for Summary Judgment Should be Denied with Prejudice**

The Wexford Defendants have wasted significant resources by bringing this frivolous and premature motion for summary judgment. Their motion fails to take seriously the summary judgment standard by misrepresenting the record in several respects and asking this Court to resolve numerous factual disputes in their favor. *See Littler v. Martinez*, No. 216CV00472JMSDLP, 2019 WL 1043256, at *3 (S.D. Ind. Mar. 5, 2019) ("When defendants move for summary judgment…there must be a good-faith basis to argue that summary judgment is warranted") (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (for the proposition that failure to take seriously the summary judgment standard is improper and sanctionable).

Not only that, Defendants ask this Court to extinguish Plaintiff's claims based on a purported lack of evidence regarding the medical standards after asking Plaintiff to wait to engage in expert discovery. This is unacceptable gamesmanship.

Defendants make explicit their intention to take two bites at the apple, requesting that this Court permit them to file a *second* summary judgment brief *after* expert discovery if they are unsuccessful at this stage. ECF No. 400 at 14. Defendants should not be permitted to manipulate the process in this manner. As in *Littler*, Defendants' approach seems to be "it can't hurt to ask." 2019 WL 1043256, at *3. But it can. Plaintiff's counsel already has spent numerous hours responding to this motion which should have waited until after expert discovery, if even brought at all, and the Court will now have to expend its resources prematurely as well. Their motion

should be denied with prejudice for expending judicial resources on a frivolous, premature motion and they should be precluded from filing a second motion for summary judgment after expert discovery.

RESPECTFULLY SUBMITTED,
/s/ Samantha Reed

Harold Hirshman
Samantha R. Reed
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Harold.Hirshman@dentons.com

Samantha@equipforequality.org

## CERTIFICATE OF SERVICE

I, Samantha R. Reed, an attorney, hereby certify that on October 25, 2021, I caused a copy of the foregoing document to be served on all counsel of record via the CM/ECF system.

/s/ Samantha R. Reed