## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAVID GEVAS,

Plaintiff,

v.

SALEH OBAISI, *et al.*,

Defendants.

Case No. 16-cv-10599

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

In March 2016, inmate David Gevas was diagnosed with stage IV non-Hodgkins lymphoma while incarcerated at Stateville Correctional Center ("Stateville"). He alleges that this was a delayed diagnosis that required more intensive chemotherapy treatment than if it had been caught earlier and caused him pain, suffering, and diminished life expectancy. Gevas filed this lawsuit in November 2016 pursuant to 42 U.S.C. § 1983, alleging that Stateville medical provider, Wexford Health Sources, Inc. ("Wexford') and Wexford doctor Dr. Obaisi (collectively the "Wexford Defendants"), and the Director of IDOC and the Stateville warden (collectively, the "IDOC Defendants") violated his Eighth Amendment rights because they were deliberately indifferent to his medical conditions. The Wexford Defendants and IDOC Defendants have moved for summary judgment. For the reasons stated below, the IDOC Defendants' summary judgment motion [395] is granted in part and denied in part. The Wexford Defendants' motion for summary judgment [398] is granted in part and denied in part.

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

## BACKGROUND[1]

Gevas was housed at Stateville at all times relevant to this action. (IDSOF ¶ 1). The time period for his complaint goes through September 12, 2017. *Id*. ¶ 18. Defendant Pfister was warden of Stateville from November 2015 through February 2018 *Id*. ¶ 2. Defendant Baldwin was acting director of IDOC from August 14, 2015 through May 2019. *Id*. ¶ 3. Wexford is a company that provides medical services to inmates at Stateville pursuant to its contract with the IDOC. (WDSOF ¶ 3). Ghalia Obaisi is the independent administrator of the Estate of former Defendant, Saleh Obaisi, M.D. deceased ("Dr. Obaisi"). Dr. Obaisi was employed by Wexford as the Medical Director of Stateville from August 2012 until he died on or about December 23, 2017. *Id*. ¶ 4.

On May 6, 2014, Gevas was discharged to Stateville after a week-long hospitalization during which he was diagnosed with sleep apnea, atrial fibrillation, and a small pulmonary micronodule in his lung. (PSOF ¶ 1). The discharge instructions, which were received by both Dr. Obaisi and Wexford's corporate offices, instructed that Gevas should have a follow-up chest CT scan in either 6-12 months or in 3-6 months, and another scan in 9-12 months if stable. *Id*. On May 19, 2014, nearly two weeks after being discharged to Stateville from UIC with diagnoses of sleep apnea, atrial fibrillation, and a pulmonary nodule requiring follow-up, Gevas attended a post hospitalization evaluation with Dr. Obaisi. *Id*. ¶ 5. Dr. Obaisi noted Gevas's diagnosis of obstructive mild sleep apnea but did not write anything in the

---

[1] The facts are taken from the parties' Rule 56.1 statements and are undisputed unless otherwise noted.

progress note about ordering a CPAP machine as recommended by UIC, and did not note UIC's recommendation to schedule a follow-up CT scan to monitor the pulmonary micronodule found in Gevas's lung. *Id.*[2]

On August 5, 2015, Gevas presented to Stateville medical staff with throbbing pain in his lower back and lower left leg that was constant and getting worse. *Id.* ¶ 12. He was referred to Dr. Obaisi. *Id.*[3] On December 28, 2015, Mr. Gevas presented to nurse sick call reporting chest pain, productive coughing with clear sputum, pain when coughing, shortness of breath, chills, and night sweats and was initially prescribed antibiotics and cough drops. *Id.* ¶ 16.[4] On February 8, 2016, Gevas had a follow up appointment with Dr. Obaisi. *Id.* ¶ 19. Dr. Obaisi's notes from the February 8 appointment indicate that his plan included a chest x-ray, prescription of prednisone, and "CXS sputum." *Id.* ¶ 20. When the chest x-ray completed on February 10, 2016 revealed no explanation for Gevas's ongoing symptoms, a request was put in with Wexford for a chest CT scan for Gevas. *Id.* ¶ 21. However that request was denied in Wexford's collegial review process on February 16, 2016, with a notation

---

[2] The Defendants dispute in part this fact. The note the Court believes Defendants refer to does state that the CPAP request was received and approved, however there is no notation for a follow-up or that the CPAP machine was ordered. (Dkt. 399-9 at 16).

[3] Defendants dispute in part this fact but do not cite any evidence that "MD" refers generally to "physicians sick call" and not to Dr. Obaisi or "medical director".

[4] The Defendants dispute in part this fact but its dispute is essentially that Obaisi's condition was improving in February 2016. Defendants' response does not directly address the asserted fact.

stating that Gevas's symptoms were controlled on prednisone. *Id*.[5] On March 2, 2016, Gevas was seen by a nurse following a urology appointment at UIC and reported pain in his shoulder. *Id*. ¶ 23. On March 21, 2016, Gevas reported to Dr. Obaisi that he had the "same cough without prednisone" and that he had tenderness in his shoulder, near his scapula blade. *Id*. ¶ 24.

On March 30, 2016, Gevas reported to sick call that he had had chest pain for the past two days, even at rest, had tightness and burning in his chest, was experiencing shortness of breath and arm pain, and had vomited that day. *Id*. ¶ 25. Dr. Obaisi prescribed 50 mg of Metoprolol and sent him back to his housing unit. *Id*. As Medical Director at Stateville, Dr. Obaisi was responsible for all referrals to UIC, for communication with outside hospitals, and for referrals to collegial review for off-site testing. *Id*. ¶ 69.[6]

The next day, March 31, Gevas presented with progressively worsening chest pain and was sent to St. Joseph's medical center, where a CT angiogram revealed chest and abdominal lymphadenopathy, pulmonary nodules, lytic lesions in ribs and spine consistent with metastic disease and likely pathological fracture in right clavicle. *Id*. ¶ 26. Gevas was transferred to UIC Medical Center, where a CT scan of his chest, abdomen, and pelvis was done on April 7, 2016. *Id*. ¶ 27. It further revealed "numerous lytic lesions throughout the spine, pelvis and left ribs with additional

---

[5] The collegial review process is an internal process by which Wexford reviews the medical necessity and clinical appropriateness of referrals for off-site services. The determination of whether or not to send a particular prisoner to UIC Medical Center is one of the issues discussed in collegial review. *Id*. ¶ 58.

[6] This part of the asserted fact is not disputed by Defendants.

large lytic mass within the right clavicle causing pathological fracture" as well as "mediastinal lymphadenopathy and bulky retroperitoneal lymphadenopathy" as well as multiple pulmonary nodules. *Id*. He was instructed to avoid heavy lifting and take precautions against falling…" *Id*. Lytic lesions are weak spots where the bone has been replaced by cancerous tissue. *Id*. ¶ 28. Gevas was later diagnosed with stage IV diffuse large B-cell lymphoma with multifocal bone disease in the spine, rib, and clavicle and extranodal disease (lung nodules). *Id*. ¶ 29. The lymphoma had also caused a pathological fracture in Gevas's right clavicle, near his shoulder. *Id*. ¶ 30.

In his Fourth Amended Complaint (FAC), Gevas alleges that his Eighth Amendment rights were violated by Ghaliah Obaisi (for the estate of Dr. Saleh Obaisi) (Count I), Director Baldwin (Count II), Warden Pfister (Count III), and Wexford (Count IV). Gevas also brings state-law claims for medical malpractice against Obaisi (Count V), respondeat superior - medical malpractice against Wexford (Count VI), and institutional negligence against Wexford (Count VII).[7]

## ANALYSIS

### I.     The Eighth Amendment

The Eighth Amendment requires prison officials to provide healthcare to incarcerated inmates who cannot obtain healthcare on their own, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021), and imposes liability on those who act with deliberate indifference to a substantial risk of serious harm to inmates, *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021). A plaintiff alleging deliberate

---

[7] On August 4, 2021, Gevas and the IDOC Defendants stipulated to the dismissal of certain claims and Defendant Christerson. [388].

indifference must show: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *See id*. In this case, Defendants do not dispute that Gevas's medical conditions were objectively serious, so only the second prong is in dispute.

The second prong, the subjective inquiry, requires a plaintiff to provide evidence that each defendant acted "with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "To establish deliberate indifference, a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

## II.    The IDOC Defendants

The IDOC Defendants argue that Gevas cannot establish their personal involvement because Gevas only named them in this suit because of their role in the grievance procedure. Gevas responds that Baldwin and Pfister were personally involved and their failure to act to provide adequate medical treatment to prisoners lead Gevas to suffer from atrial fibrillation, sleep apnea and delayed cancer diagnosis. The Court finds that Gevas has not presented evidence of Baldwin's personal involvement to create a triable issue of fact, but has done so with respect to Pfister.

To be liable for an alleged deprivation of constitutional rights, a defendant must be "personally responsible" for the deprivation. *Mitchell*, 895 F.3d at 498. This is satisfied if the constitutional violation occurs at a defendant's "direction or with her

7

knowledge or consent." *Id*. Even if a defendant did not "take part" in the constitutional deprivation, he may nevertheless be liable if he "acquiesced in the failure to provide necessary medical treatment." *Id*. A plaintiff seeking to hold supervisors liable cannot "rely on a theory of respondeat superior but, instead, must present evidence that the defendants violated the Constitution through their own conduct." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022).

The parties dispute whether the IDOC Defendants' involvement in the grievance process is sufficient to give rise to their personal liability. In this context, courts assess whether the grievance officials "obtained actual knowledge" of plaintiff's medical condition and inadequate medical care. *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015). Courts have found that a plaintiff provided sufficient evidence to survive summary judgment on this issue when, in addition to submitting grievances, there was evidence that the plaintiff spoke in person with or wrote letters to the official. *See Snow v. Obaisi*, No. 1:17 CV 4015, 2021 WL 4439421, at *8-9 (N.D. Ill. Sept. 28, 2021) (finding that plaintiff submitted sufficient evidence to allow a reasonable jury to find that the warden knew about plaintiff's serious medical conditions, including plaintiff's testimony that he had conversations with the warden and wrote him letters); *Thomas v. Wexford Health Servs., Inc.*, 414 F. Supp. 3d 1154, 1162-63 (N.D. Ill. 2019) (plaintiff provided evidence from which it could be reasonably inferred that warden "had actual knowledge" about plaintiff's delayed medical care including plaintiff's testimony that he told the warden that he was having trouble breathing and needed a follow-up appointment); *Taylor v. Wexford Health Sources,*

8

*Inc.*, No. 16-CV-3464, 2022 WL 4329025, at *16 (N.D. Ill. Sept. 19, 2022) ("Plaintiff presented evidence that he filed grievances with [officials] *and that he spoke to both of them about his conditions*.") (emphasis added).

Here, the IDOC Defendants argue that Gevas cannot rely solely on their role in the grievance process. However, Gevas, relying on his October 2021 affidavit, contends that in addition to grievances, he wrote letters to the IDOC Defendants. He states that he wrote them three letters in January and February 2016 about his conditions including his need for a CT scan. (Gevas Aff. (Dkt. 406-1)). The IDOC Defendants criticize Gevas's affidavit as "self-serving" (Dkt. 415 at 5). However, as the Seventh Circuit has explained, "[o]ur cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (cleaned up).[8] The IDOC Defendants argue that Gevas's statements in his affidavit conflict with Gevas's prior testimony, but about *Baldwin* only. (Dkt. 415 at 5). The Court agrees that at his deposition (Gevas Dep. (Dkt. 399-2)), Gevas testified to communicating with Baldwin only through the grievance process. As for Pfister, however, Gevas testified that he communicated with Pfister about his health outside of the grievance process. (*Id*. at pp. 20-23).

---

[8] The IDOC Defendants also argue that "nothing in this case that demonstrates that the IDOC Defendants received or reviewed Plaintiff's alleged letters." (Dkt. 415 at 9). The IDOC Defendants do not cite any authority showing Gevas was required to attach the referenced letters to his affidavit. In essence their argument challenges Gevas's credibility, but the Court will not decide credibility issues on summary judgment. *See Viamedia,* 951 F.3d at 467.

9

Therefore, Gevas has presented sufficient evidence of Pfister's personal responsibility to survive summary judgment. Because Pfister became warden of Stateville in November 2015 (IDSOF ¶ 2), the claims against him will be limited to November 2015 through September 2017. Gevas does not dispute this.

Gevas argues that a jury could infer the IDOC Defendants' personal involvement because of the 2014 Report of medical expert Dr. Ronald Shansky which "detailed these systemic issues [with the healthcare system in Illinois Prisons] and put Defendants on notice of these problems." (Dkt. 407 at 7).[9] However as the Seventh Circuit recently reiterated, "we have repeatedly held such reports [the Shansky reports] are inadmissible hearsay and thus their contents cannot be offered for the truth of the matter asserted." *Stockton*, 44 F.4th at 617; *Shafford v. Wexford Health Sources, Inc.*, No. 16 C 50111, 2020 WL 1304821, at *1 (N.D. Ill. Mar. 19, 2020), aff'd, No. 20-1810, 2021 WL 4958769 (7th Cir. Oct. 26, 2021) (declining to consider Shansky report as evidence on summary judgment). Even if the Court considered the Shansky Report as evidence that Baldwin had *notice* of problems at Stateville, the Shansky Report is the sole evidence Gevas has provided, outside of Baldwin's role in the grievance process, to argue that Baldwin was personally involved in the alleged constitutional violation. The Court finds that this does not show that Baldwin "obtained actual knowledge" (*Perez*, 792 F.3d at 782) of *Gevas's* medical condition and

---

[9] The Shansky Report was prepared by plaintiffs in a class-action brought by individuals in IDOC custody, *Lippert v. Godinez*, Case No. 10-cv-4603.

inadequate medical care or "violated the Constitution through [his] own conduct." *Stockton*, 44 F.4th at 619.

Finally, Gevas does not object to the IDOC Defendants' argument that his claims for injunctive relief and official capacity claims are moot. In sum, the IDOC Defendants' summary judgment motion [395] is granted as to Baldwin and denied as to Pfister, and granted as to the official capacity and injunctive relief claims.

## III.   Wexford Defendants – Federal Claims

The Court next turns to the Wexford Defendants' summary judgment motion. The Wexford Defendants argue that Gevas has not provided any evidence that treatment he received at Stateville was a substantial departure from accepted professional standards. Medical professionals generally have discretion in treatment decisions so a plaintiff must establish that the medical professional's acts are "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). The Wexford Defendants further argue that Gevas has not produced sufficient evidence showing that Wexford had an unconstitutional policy or practice, or that any such policy or practice was a driving force behind his alleged constitutional injury.

First, as to Dr. Obaisi, the Court finds that there is a triable issue about whether he was deliberately indifferent to Gevas's lymphoma and sleep apnea. However

11

summary judgment is granted to Dr. Obaisi on Gevas's claim about atrial fibrillation.[10]

### a. Lymphoma

Gevas has provided sufficient evidence creating a jury question about whether Dr. Obaisi knew of and disregarded known risks of harm to Gevas by failing to order follow-up CT scans after a UIC radiologist found a pulmonary micronodule in 2014. When a CT scan was finally done nearly two years later in April 2016, Gevas was diagnosed with stage IV diffuse large B-cell lymphoma. Although he received the recommendation for a follow-up CT scan to monitor the pulmonary micronodule, Dr. Obaisi did not put in an order for it and actually *denied* a chest CT scan request during a collegial review process in February 2016. When Gevas reported chest pain and tightness, shortness of breath, arm pain, and vomiting on March 30, 2016, Dr. Obaisi prescribed medicine and sent him back to his housing unit. The next day, with worsening chest pain, Gevas was sent to St. Joseph's medical center, where a CT angiogram revealed among other things, chest and abdominal lymphadenopathy, pulmonary nodules, and lytic lesions with metastic disease. Gevas was transferred to UIC Medical Center, where a CT scan done on April 7, 2016 revealed numerous lytic

---

[10] The Court notes initially that in several instances, the Wexford Defendants argue that Gevas failed to produce the grievances and correspondences he references. The Court does not find that dispositive. As a court in this district has explained, "[t]he general assertion that [plaintiff] filed grievances is within his personal knowledge and something he could testify to at trial. That he does not offer or cite to specific grievances he filed, their substance, or how they were resolved, goes to the weight of the assertion." *Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *2 (N.D. Ill. Sept. 18, 2020).

lesions with a large lytic mass within the right clavicle causing a fracture, multiple pulmonary nodules and lymphadenopathy.

Gevas has presented evidence that the delay in receiving a CT scan caused him harm. "When a plaintiff alleges that a defendant delayed, rather than denied, medical treatment, he must present 'verifying medical evidence' that the delay, not the underlying condition, caused 'some harm.'" *Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *8 (N.D. Ill. Sept. 18, 2020) (citations omitted). "If the evidence falls somewhere in between a bare recitation of treatment received and expert testimony about the delay's effect, that is sufficient to survive summary judgment on whether the delay caused harm." *Id.* (cleaned up). Gevas's testimony about his worsening condition and his complaints to the medical staff[11], combined with the medical records showing Dr. Obaisi did not follow up on a recommendation for a CT scan and even later denied another request for a CT scan, create a jury question about whether Dr. Obaisi was deliberately indifferent to Gevas's medical condition. Moreover, testimony of the Wexford Defendants' own expert, Dr. Neil Fisher, supports Gevas's position that summary judgment is not warranted. Dr. Fisher testified that it was possible that the back and leg pain that Gevas reported in August 2015 was caused by the cancer that was then discovered in 2016, and after the January 2016 x-ray of the rib, the doctor should have spoken to Gevas about what

---

[11] Defendants argue that not all of these complaints are in the medical records. However, at this stage the Court will not question Gevas's credibility or choose between competing inferences. "The court does not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (citation omitted).

could have caused the broken rib, and a possible cause of the fracture could have been cancer. (Dkt. 406-2, pp. 103-05, 107-08).

The Wexford Defendants argue that the follow-up CT scans ordered by the UIC radiologist in April 2014 were "to make sure [Gevas] did not develop lung cancer, not lymphoma." (Dkt. 400 at 7). They also argue that biopsies on in May 2014 "rul[ed] out lymphoma at that time." *Id.* However these are not accurate representations of the medical records. They do not say lymphoma was "ruled out." Instead during the biopsies, "lymphocytes were seen," but "no *other* significant adenopathy seen at paratracheal or bilateral [] areas." (Dkt. 399-9 at 11, emphasis added). The Wexford Defendants also make the completely unsupported argument that "clearly, the risks of harmful exposure to radiation do not warrant constant CT scan in the hope of making incidental findings." (Dkt. 400 at 7).[12]

Thus there is a triable issue of fact about whether Dr. Obaisi's failure to order a CT scan and monitor Gevas's pulmonary micronodule caused Gevas harm.

### b. Sleep apnea

Gevas also alleges that Dr. Obaisi was deliberately indifferent to his sleep apnea and need for a CPAP machine. In May 2014, after Gevas's hospitalization and obstructive sleep apnea diagnosis, Dr. Obaisi and Dr. Garcia, approved him for CPAP. However, he did not receive a CPAP machine until August 2017. In his affidavit and

---

[12] *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911 (7th Cir. 2020), relied on by Defendants, is distinguishable because in that case the prison doctor did not receive a specific recommendation of a diagnostic imaging follow up for an inmate within a specific amount of time.

at his deposition, Gevas testified that Dr. Obaisi told him he ordered the CPAP machine, and in the subsequent years, Gevas continued to follow up with Dr. Obaisi about the CPAP machine.[13]

The Wexford Defendants argue that on May 30, 2014, the pulmonologist "recommended weight loss…in lieu of a CPAP." (Dkt. 400 at 6). Although the pulmonologist recommended weight loss *and* a sleep study (Dkt. 399-9 at 17), nothing in this medical record states that these were recommended *instead of* a CPAP. The Wexford Defendants do not cite evidence that Dr. Obaisi believed the pulmonologist to be recommending that Gevas *not* receive a CPAP machine. In addition, the Court is confused by the Wexford Defendants' argument stressing Gevas's failure to do a sleep study in 2013, since in 2014, Gevas did a sleep study and a CPAP machine was recommended for him then, and Dr. Obaisi and utilization management physician, Dr. Garcia, *approved* Gevas for CPAP on May 19, 2014. (WSOF ¶¶ 17, 22). In short, regarding his sleep apnea, this is not a case of Gevas insisting on some "particular care of [his] choosing." *Woods v. Obaisi*, No. 21-1659, 2022 WL 2113080, at *2 (7th Cir. June 13, 2022). Rather he was seeking the particular care that had been specifically approved for him.

---

[13] Defendants object to this testimony since progress notes do not reference complaints from Gevas regarding sleep apnea or reference Dr. Obaisi discussing a CPAP machine with him. Again, the Court declines to assess Gevas's credibility on summary judgment. Further, Defendants do not dispute that Gevas's sleep apnea was a serious medical condition that Dr. Obaisi was aware of and that Dr. Obaisi himself approved a CPAP machine for Gevas.

Accordingly a reasonable jury could conclude that Dr. Obaisi's failure to order a CPAP machine constituted deliberate indifference. Summary judgment on this claim against Dr. Obaisi is denied.

### c. Atrial fibrillation

The Wexford Defendants argue that Dr. Obaisi was not deliberately indifferent to Gevas's atrial fibrillation. Gevas does not dispute that Dr. Obaisi was aware of and provided him medication for this condition. Gevas also does not dispute that after three days of worsening chest pain, he was sent to St. Joseph's hospital. Gevas argues that the Defendants rely on January 2016 medical records showing an increase in his medication, "but there is strong evidence to suggest that this is a transcription error" and the increase did not actually happen. (Dkt. 408 at 20).[14] Gevas's transcription error theory appears speculative. Even if the evidence was clear that Dr. Obaisi did not increase his medication at this time, Gevas has not shown how this rises to the level of "'"grossly inadequate medical care.'" *Woods*, 2022 WL 2113080, at *2 (citations omitted). Showing deliberate indifference poses a "high hurdle" for a plaintiff. *Donald*, 982 F.3d at 458 (internal quotation marks omitted). "Negligence—even gross negligence—is insufficient to meet this standard," though a plaintiff need not show intentional harm. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

The Wexford Defendants' summary judgment motion based on the atrial fibrillation is granted.

---

[14] The Court is unable to read the handwriting in this medical record in Dkt. 406-13.

### d. *Monell* claim against Wexford

Next the Court considers Gevas's Eighth Amendment claim against Wexford. Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), Wexford faces liability under section 1983 only for constitutional injuries caused by "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell*, 987 F.3d at 653; *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Plaintiff must "offer evidence of causation: that the unconstitutional custom, policy, or practice at the Jail was the 'moving force' behind the constitutional deprivation." *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016) (cleaned up).

Gevas contends that Wexford has "several practices, customs, or patterns of bad acts that demonstrate deliberate indifference": inadequate medical record keeping, failure to establish a procedure to track patients who receive offsite services and require additional follow-up, using a deficient collegial review process, hiring an underqualified physician to act as Medical Director, and inadequate staffing. The Wexford Defendants object to Gevas relying on expert reports from another case in this district; they object to him relying on either Lippert report. As already discussed, the Seventh Circuit has "repeatedly held such reports are inadmissible hearsay and thus their contents cannot be offered for the truth of the matter asserted." *Stockton*, 44 F.4th at 617. And given the relevant time frame for this case, there is no basis for

17

Gevas to rely on the 2018 Puisis Report. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 221 (7th Cir. 2021). However, in *Dean*, the Seventh Circuit did not decide whether the district court abused its discretion in admitting the 2014 Shansky report. *Id.* at 234.

In a footnote, Gevas asserts: "Defendants argue that the Lippert reports are impermissible hearsay, but the Shansky Report is put forth here to show that Wexford was on notice of these systemic problems, not for the truth of the matter asserted." (Dkt. 408, n. 2). Gevas argues that at Stateville, the Shansky Report found that it was common that patients who had received consultations or procedures at UIC had not received appropriate follow up, and recommended that Wexford develop a system for logging outside appointments and necessary follow-up.[15] Unlike in *Dean*, the 2014 report *does* link directly to the facility here, Stateville. *Dean*, 18 F.4th at 238. And Dr. Fisher, assistant chief medical officer at Wexford, testified that he was familiar with and had read the Shansky report and "we did help the IDOC respond to the Shansky report." (Fisher Dep. (Dkt. 406-3) pp. 11-12)). In addition, Dr. Ritz, who had been employed at Wexford since 2014 and reviewed Gevas's case in collegial review, testified that he read the Shansky report with respect to the care that was being provided by Wexford. (Ritz Dep. (Dkt. 399-8), p. 106).[16]

---

[15] The Shansky Report found that "at every facility, there were examples of patients who had received consultations or procedures but no follow up with the patient had occurred. This was quite common at some facilities, including Stateville…" Shansky Report, p. 32.

[16] In addition, Baldwin testified that he was familiar with the Shansky Report including problems with follow up for prisoners sent out to outside hospitals for certain health services. PSOF ¶ 41. Baldwin testified that he believed he had some responsibility for assessing the

Therefore Gevas has provided sufficient evidence in his case creating a question of fact for a jury on this *Monell* claim.

In addition, Gevas has sufficient evidence at this stage that the follow-up failure after his UIC discharge caused his delayed cancer diagnosis. But other than this claim, Gevas puts forth no evidence that Wexford's alleged unconstitutional practice is what caused him to receive constitutionally deficient medical care. Without evidence of causation, his section 1983 claim against Wexford fails as a matter of law. *See Pulera v. Sarzant*, 966 F.3d 540 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1509 (2021).

For the stated reasons, this Court grants summary judgment to Wexford on Gevas's *Monell* claim, with one exception: the claim related to patients who receive offsite services and require additional follow-up.

## IV. Wexford Defendants – State Law Claims and Punitive Damages

### a. State law claims

Gevas claims that Dr. Obaisi is liable for medical malpractice under Illinois state law. For his medical-malpractice claim, Gevas must establish that Dr. Obaisi deviated from the standard of care, and that proximately caused his injury. *Miranda*

---

validity of the claims in the Shansky report. (Baldwin Dep. (Dkt. 406-4) at pp. 21-22). This responsibility included, he said, "at a macro level [to] try[] to change how we provided health care to the offender population"; he further testified "we have a duty to provide adequate health care," and he relied on health care staff at the facility to provide medical care to the inmates. *Id*. at pp. 21-25. Baldwin also confirmed that Gevas's allegations about follow-up failures appeared consistent with the problem Shansky identified. *Id*. at pp. 13-14. Although Baldwin was the IDOC acting director, his testimony along with the Wexford doctors' testimony, the undisputed fact that IDOC contracts with Wexford to provide medical care, and the Shansky Report findings, could give rise to the reasonable inference that Wexford was aware of and deliberately indifferent to the follow-up issues Gevas experienced.

*v. Cty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018) (citation omitted). Illinois law requires that these elements must be established by expert testimony "to a reasonable degree of medical certainty." *Id*. In response to the Wexford Defendants' summary judgment motion, Gevas relies on the October 2021 affidavit of Dr. Paulette Finander. (Dkt. 406-12). Dr. Finander opines that to a reasonable degree of professional certainty, "defendants did not follow the medical standards of care as to their duty to evaluate Mr. Gevas…leading to a delay in diagnosis of Mr. Gevas's lymphoma malignancy." *Id*. The Wexford Defendants object to Gevas relying on this expert. Indeed in September 2020, the Court stayed expert discovery pending the resolution of Defendants' summary judgment motion. (Dkt. 324).

At this time, the Court will not strike this affidavit or rule on Defendants' *Daubert* challenge. Defendants' summary judgment motion on this claim, Count V, is denied without prejudice. Accordingly, summary judgment on Count VI against Wexford is also denied without prejudice.

Finally, as to the institutional negligence claim against Wexford, Count VII, Wexford argues that it fails for the same reasons the *Monell* claims fail: Gevas "has not come forth with evidence sufficient to show that the alleged inadequate medical care or resulting injuries were caused by anything other than the individual decisions or negligence on the part of the Stateville medical staff." (Dkt. 400 at 13). However as discussed, since one *Monell* claim against Wexford has survived, this claim survives as well.

### b. Punitive damages

The Wexford Defendants finally contend that even if his claims survive, Gevas does not have evidence that punitive damages are warranted. Gevas concedes that punitive damages are not recoverable against the estate of a deceased Defendant and is not pursuing punitive damages against Obaisi. But Gevas argues that summary judgment is not appropriate on the question of whether punitive damages are recoverable against Wexford. With one *Monell* claim surviving against Wexford, the Court will not dismiss the punitive damages claim against Wexford. *See Flournoy*, 2020 WL 5593284, at *15 ("Since there is a triable issue about whether Wexford had a custom or practice of withholding prescribed medicine, Wexford's motion for summary judgment on punitive damages is denied.").

## CONCLUSION

For the stated reasons, the IDOC Defendants' summary judgment motion [395] is granted in part and denied in part. The Wexford Defendants' motion for summary judgment [398] is granted in part and denied in part.

E N T E R:

Dated: November 18, 2022

_____
MARY M. ROWLAND
United States District Judge

21