Affidavit for GEVAS

January 8, 2023

Paulette Finander MD

I, Paulette Finander MD, CCHP-P am a physician licensed to practice medicine in the states of New York, California, Florida, Kentucky, Virginia, and Wyoming. I am board certified in Internal Medicine with expertise in the standards of care applicable to incarcerated patients. I have been in practice for over thirty years and currently work as a physician consultant reviewing adequacy of healthcare provided to inmates in jails, prisons, juvenile facilities, and Opioid Treatment Programs in correctional facilities nationwide. I am familiar with, and qualified to opine upon, the standards for diagnoses and treatment of incarcerated patients by reasonable careful primary care providers (internists and family medicine physicians) as well as specialists to whom primary care physicians refer. I am also familiar with the methods and procedures for evaluation, diagnosis, and treatments for the medical conditions at issue in this case.

I have reviewed the Complaints and medical records for the dates April 2014 through December 2022 regarding the care provided to David C. Gevas (thereinafter Plaintiff) during his incarceration. Based upon the medical records and my training and experience it is my opinion that a reasonable physician would find that there have been multiple instances of delay in diagnosis and delay in provision of medical care for David C. Gevas.

The most recent and currently the most pressing instance of delay in diagnosis and delay in provision of medical care for David C. Gevas is currently ongoing. When seen July 11, 2022 at a hematology/oncology follow-up specialist visit at the University of Illinois at Chicago Medical Center for Mr. Gevas' large B Cell lymphoma, the specialist recommended that Mr. Gevas have a PET/CT full body scan ASAP and follow-up with the hematology/oncology specialist to determine if Mr. Gevas' catheter port needed surgical removal.

However, a repeat CT/PET whole body scan was not performed until November 11, 2022 which is approximately four months later. His PET/CT scan showed a new left lower lobe pulmonary (lung)

nodule that was 1.3 centimeters in size with hypermetabolic activity that was suspicious for recurrent lymphoma versus a primary lung malignancy.  Unfortunately, Mr. Gevas has not yet been seen in follow-up by the hematology/oncology specialist following National Cancer Comprehensive Network standards so that the specialist can compare the November 2022 CT/PET scan to Mr. Gevas' prior radiology studies and obtain for Mr. Gevas in a timely manner the appropriate medical care that is required under national standards of care for the diagnosis and treatment of possible relapsed B-cell lymphoma.  Not doing so would subject Mr. Gevas to the consequences of delayed diagnosis and delayed treatment which will then be unlikely to yield another remission for Mr. Gevas' lymphoma.  No notes of any further oncology or hematology specialist follow-up visits or repeat CT scans or CT/PET scans were available to me at this time (though I understand that the parties are seeking to update the medical records previously produced in discovery in 2019/2020).

Mr. Gevas' saga of delay in diagnosis and provision of timely medical care for his serious, possibly life threatening medical illness began on April 29, 2014, while the Plaintiff was incarcerated at the Stateville Correctional Center in Crest Hill, Illinois, he was noted to have a very rapid heartbeat.  He was transferred emergently out of the correctional facility and then admitted that day to University of Illinois at Chicago Medical Center with atrial fibrillation and a rapid ventricular response, an abnormal heart rhythm that was making his heartbeat too fast and causing symptoms of chest fluttering and palpitations.  A CT (computerized axial scan) of the chest was done to rule out the presence of a pulmonary embolus (blood clot to the lung) as the cause of the abnormal and rapid heart rhythm (the atrial fibrillation).  A pulmonary embolus (blood clot in the blood vessels of the lungs) was not detected but the CT scan of the chest showed "small pulmonary micronodules and a 6-centimeter subcarinal lymph node versus a mass".  The radiologist's reading of the CT scan went on to state that "Per Fleischner society guidelines (Radiology 2005; 237:395-400), for patients at low risk for malignancy, a 6 – 12-month follow-up chest CT is suggested.  If stable, they should be followed up with chest CT at 18 – 24 months.  For patients at high risk, such as smokers, follow-up chest CT in 3 - 5 months is suggested.  If stable, a follow-up chest CT scan at 9 to 12 and 24 months should be obtained".  Fleischner Society guidelines are followed by physicians not only in the United States but also worldwide as they are international standards.

When Mr. Gevas was discharged from the hospital back to the prison, the discharge instructions written by the hospital attending indicated in bold that Mr. Gevas should have "a follow-up CT scan of the chest in 3-6 months is suggested as patient has a history of smoking" following the Fleischner Society guidelines.

This discharge summary was sent to the prison with the Plaintiff and it was reviewed by Dr. Obasi, the facility Medical Director as documented in Dr. Obasi's progress notes.

However, no follow-up CT scan was ordered for Mr. Gevas during the rest of 2014, during all of 2015 as well as the first three months of 2016, a period of twenty-three (23) months. In addition, during the last few months of 2015 through the first few months of 2016 which is more than one year following the hospital discharge, Mr. Gevas developed a cough, had shortness of breath, drenching night sweats, chills, and a twenty to thirty pound unintentional weight loss as well as persistent clavicular pain. A CT scan of the chest was ordered by Dr. Obasi but when discussed with Wexford Medical Director Dr. Ritz on 2/16/2016, Dr. Obasi noted that Mr. Gevas' productive cough was improving and that a chest X-ray showed no significant lung pathology so the request for the CT scan of the chest was initially approved but then put on hold. The paperwork submitted did not indicate that Mr. Gevas' abnormal CT of the chest done almost two years earlier was considered in this decision. Of note, a chest X-ray is likely not to have been sensitive enough to detect the pathology that was found on Mr. Gevas' lung CT scan performed approximately two months later In April 2016.

In April 2016 which was two years after Mr. Gevas' initial hospitalization in April 2014 at which the abnormal CT scan of the chest was noted and which at discharge a follow-up CT scan of the chest was recommended by both the hospital attending and the hospital radiologist to be performed in a few months following international guidelines but which was never ordered by the prison medical staff, the Plaintiff was again hospitalized for chest pain. During this April 2016 hospitalization, Mr. Gevas was found to again have nodules in his lungs but now there also were diffusely enlarged lymph nodes in the chest and retroperitoneum (behind the abdominal organs), lytic lesions in his ribs, spine, and clavicle, and with a pathological fracture due to invasive cancer in his right clavicle. Further workup determined

that these findings were due to Mr. Gevas' diffuse (throughout the body) large B cell lymphoma, a type of cancer of the blood cells and bone marrow and which is serious and life threatening.  The lymphoma was present in Mr. Gevas' lungs, in lymph nodes throughout his body, in his bones with bony involvement so extensive that it caused a pathological fracture of the clavicle, and also in other extranodal (disease outside the lymph nodes) locations on both sides of the diaphragm.

Because of the inactions and actions by the defendants, individually and together, Plaintiff now required toxic chemotherapy to treat a widespread cancer that seriously curtails his life expectancy and which has left him with a legacy of pain due to the pathological fracture and lytic bone lesions in his spine and rib than if he had been diagnosed promptly with timely follow-up CT scans that would have allowed his lymphoma to be diagnosed and treated at an earlier stage.

On April 26, 2016, Mr. Gevas was started on the first of six cycles of toxic chemotherapy to treat his widespread cancer (the Stage IV diffuse large B cell lymphoma).

Fortunately, Mr. Gevas had an excellent response to the chemotherapy.

When seen at his December 29, 2019 hematology/oncology follow-up specialist visit at the University of Illinois at Chicago Medical Center, Mr. Gevas was found to be in CR (complete remission) with no evidence of disease on CT scan performed October 2019.

Except for a follow-up appointment scheduled for April 30, 2020 which was cancelled due to COVID 19 concerns, Mr. Gevas did have follow-up appointments with the hematology/oncology specialist every six months for the first five years (April 2016 through March 2021) following the initial April 2016 diagnosis of Mr. Gevas' lymphoma following National Cancer Comprehensive Network Guidelines for Diffuse Large B-Cell Lymphoma.

The National Cancer Comprehensive Network is a not-for-profit alliance of 32 leading cancer centers devoted to patient care, research, and education dedicated to improving and facilitating quality,

effective, equitable, and accessible cancer care so all patients can live better lives. By defining and advancing high-quality cancer care, NCCN guidelines are used by medical clinicians, around the world. According to the National Cancer Comprehensive Network guidelines for Diffuse Large B-Cell Lymphoma, beginning in April 2021 (which is five years after Mr. Gevas' initial diagnosis of lymphoma) Mr. Gevas should be seen by his hematology/oncology specialist every year or sooner as clinically indicated.

National standards of care mandate that Mr. Gevas receive no further delays in the diagnosis and treatment of his lymphoma.

*/s/ Paulette Finander*
Dr. Paulette Finander
January 9, 2023