DAVID GEVAS,

    Plaintiff,

v.

SALEH OBAISI, *et al.*,

    Defendants.

No. 16 C 10599

Hon. Judge Mary M. Rowland

Magistrate Judge Sunil R. Harjani

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
THE WEXFORD DEFENDANTS' MOTION FOR RECONSIDERATION**

Defendants' grounds for reconsideration are obscure. The evidence in the record demonstrates that there was a widespread practice, Wexford officials knew about it but failed to fix it, and it harmed the Plaintiff. Defendants' arguments rely on a misreading of Dean and ignore the record. Their motion should be denied.

### I. Legal Standard for *Monell* Liability

To succeed on a Section 1983 and *Monell* claim for systemically inadequate medical care in a correctional setting, a plaintiff must prove an official policy, custom, or practice that was the "moving force" behind his injury. *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016); *see also Dean v. Wexford,* 18 F.4th 214, 235-6 (7th Cir. 2021). Then, the plaintiff must show that an official or policymaker knew about the systemic deficiency and failed to correct it. *Id.*

The unconstitutional policy, custom, or practice "can include both implicit policies as well as a gap in expressed policies." *Daniel,* 833 F.3d at 734; *see also Dean,* 18 F.4th at 235 ("Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action.") (internal citation omitted). In a case like this one, a plaintiff can meet their burden of showing a policy or widespread practice/custom by presenting "evidence that could allow a reasonable trier

1

of fact to find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Daniel,* 833 F.3d at 34–35.

While a plaintiff must show more than one deficiency to establish a pattern or practice, a plaintiff does *not* need to "present evidence that these systemic failings affected other specific inmates." *Daniel*, 833 F.3d at 734–35 (*citing Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) ("To establish a widespread custom or policy, the plaintiff here was not required to show that Cook County's alleged repeated pattern of delay ... actually caused pain and suffering to other inmates in need of medical intervention....")). Rather, an incarcerated plaintiff can "meet this burden by offering competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (internal quotations omitted). A defendant can be held liable for failing to act in response to a risk of harm that is either obvious or actually known. *Dean,* 18 F.4th at 235-36.

**II.     This Court Applied the Correct Legal Standard at Summary Judgment**

The legal standard cited above is exactly the standard applied by this Court in its summary judgment decision. Far from ignoring the *Dean* decision, this Court referenced it several times, noting the important ways in which this case is distinct from *Dean* and pointing out that the Seventh Circuit did not decide whether the 2014 Shansky Report could be allowed into evidence under a hearsay exception for purposes of notice. ECF No. 432 at 18. While the Seventh Circuit expressed skepticism about the propriety of admitting the 2014 Report for notice in *Dean*, that skepticism does not constitute the legal rule against admission of the Report in this case that Defendants wish it did. Even though the Report did not discuss issues specific or particular to Taylorville Correctional Center, the facility in which Dean was incarcerated, the Seventh Circuit refused to hold that it was error to allow the 2014 Report in to show notice, leaving open the

2

possibility that the 2014 Report could be admissible for notice in future similar cases as well. As this Court pointed out, the argument for allowing the 2014 Report as evidence of notice in this case is even stronger, where the 2014 Report *did* explicitly call out problems with offsite services and follow-up at Stateville Correctional Center, where Mr. Gevas was housed. ECF No. 432 at 18 ("Unlike in Dean, the 2014 report does link directly to the facility here, Stateville.").

Defendants refuse to acknowledge this important distinction, instead arguing that the 2014 Report's comments about Stateville still were insufficient as a matter of law to give Wexford notice that systemic problems with offsite services and follow-up at Stateville were causing harm. In so doing, they ignore significant sections of the 2014 Report, as well as all other evidence of the systemic problems, and Wexford's awareness thereof, in the record.

### III. The Record Contains Sufficient Evidence to Create a Triable Issue As to Whether Wexford had a Widespread Policy or Practice Regarding Offsite Medical Services that Caused Harm to Plaintiff

Defendants suggest that the only way for Plaintiff to show a pattern or practice for purposes of *Monell* liability is by showing that other incarcerated patients suffered injury from the same policies that he did. ECF No. 436 at 6 ("Here, Plaintiff has zero evidence of how other inmates were treated.") But this is not the law, as the Seventh Circuit made clear in *Daniels* and *Davis* that a plaintiff is ***not*** required to show that systemic failings affected other specific inmates. *Daniel*, 833 F.3d at 734–35; *Davis v. Carter*, 452 F.3d at 695. Rather, a plaintiff can meet his burden by other evidence that shows a pattern of repeated behavior.

In *Daniel*, the Seventh Circuit recognized the "common scenario" that also exists in this case, where an institution (or, here, a corporate defendant) has "structured its affairs so that no one person was responsible for [the inmate's] care, and such diffused responsibility can make it very difficult to show individual responsibility for health care failures." 833 F.3d at 734 (citations

3

omitted). In that case, the Seventh Circuit held that jail medical staff's testimony about difficulties in getting patients scheduled for the health care that they needed and routinely inadequate medical records to be sufficient evidence of a systemic practice—or gap in policies—that caused harm to the Plaintiff when the medical care he needed also was delayed. *Id.* at 735.

Similarly, in *Davis*, the Seventh Circuit held that testimony from a pharmacist established an absence of policies or procedures to ensure that Cook County jail patients experiencing methadone withdrawal were brought to the pharmacy to receive treatment in a timely fashion. *Davis v. Carter*, 452 F.3d 686, 692–93 (7th Cir. 2006). The pharmacist and other Cook County personnel working with patients had testified of a widespread practice of delays of up to three days in verifying a patient's outpatient methadone treatment regimen—a necessary precursor to beginning the patient's treatment at the jail. The Seventh Circuit in *Davis* explicitly rejected the Defendants' argument—similar to that made by Defendants here—that evidence of repeated past *injuries* was required to show a widespread custom or practice. *Id.* at 695. Rather, evidence showing routine delays was all that was required to introduce a question of fact. *Id.*

Ignoring all other evidence in the record, Defendants here accuse Plaintiff of using the 2014 Report to "fill in his evidentiary gap" of showing a policy or practice—or lack thereof—that caused Plaintiff harm. ECF No. 436 at 6. But in fact, Wexford's own 30(b)(6) witness, Dr. Neil Fisher, a 30(b)(6), testified that Wexford essentially had no policy, process, or guideline to ensure that discharge instructions from UIC would even be reviewed by a returning patient's treating physician, let alone to ensure that any follow-up recommended by UIC was scheduled on a timely basis. Rather, Dr. Fisher testified that in the typical case, discharge instructions from UIC would be sent back to Stateville with security officers and then handed off to medical records custodians who were employed by IDOC, rather than to the Wexford clinical providers. ECF No. 406-2,

Fisher Dep. I, at 62-63. While such records *might* be given to the clinician to review, Dr. Fisher did not describe any policy requiring that to happen. To the contrary, Dr. Fisher said that Mr. Gevas's discharge instructions might even have been filed directly into his medical record without the physician ever having seen it. *Id.* at 63; *see also* ECF No. 399-8, Ritz Dep., at 30-31 (explaining that sometimes the typed consultation note from the outside specialist was not sent or filed in the medical record in a timely manner or at all).

Another 30(b)(6) witness for Wexford, Dr. Ritz, testified that there were known problems with UIC frequently not sending discharge instructions and recommendations after offsite services had taken place, but did not explain any policy, procedure, or effort by Wexford to ensure that the appropriate documentation was obtained. *Id*. at 79-80. He further testified that nurses in Wexford's corporate office in Pittsburgh would sometimes help get those discharge instructions, but stressed that they did not do so in every case or even the typical case. *Id.* at 92-93. Thus, despite knowing of an issue with getting UIC's discharge instructions into the hands of treating physicians to make informed decisions about patient care and follow-up, Wexford did not have, nor did it create, any policy or procedure to rectify the problem.

Dr. Fisher further testified that Wexford clinical providers had sole discretion as to which parts of the medical record they would review when creating a treatment plan for a patient, and that there was no requirement that they even read the discharge instructions sent by UIC:

> Q: And with respect to the review, if the discharge summary were within the medical record would a Wexford clinician be responsible for reviewing that record or not?
>
> A. Again, a Wexford clinician may choose to review parts of the medical record if they feel it is helpful for coming up with a plan for an individual patient. There's no requirement for them to review all the pages of the medical record when developing a plan.

ECF No. 406-2, Fisher Dep. I*,* at 68-69. Wexford's corporate office did not review a facility physician's decisions to reject recommendations made by offsite providers such as UIC, instead

5

choosing to rely entirely on the clinical decisions of those providers, even when that provider's training was in general surgery rather than primary care. *Id.* at 69-70.

As for the treatment plan created by the provider based on the recommendations of offsite providers, Wexford had no policy or standardized practice for how such treatment plans must be documented or communicated. ECF No. 406-2, Fisher Dep. I, 24:10-27:16. A treatment plan would often be documented on a progress note or chronic care note, but it might not be identified as a treatment plan at all. *Id*., 83:16-22; 87:16-26 (explaining that the treatment plan "might not necessarily be identified as a treatment plan. It might be individual orders. It might be a consultation request that is written. It might be a request for studies that are being requested.").

This testimony from Wexford's corporate representatives, taken together, is sufficient for a factfinder to conclude that Wexford had an absence of policies or procedures to ensure that offsite recommendations from UIC were reviewed, documented, and followed up on in an appropriate and timely fashion. But if that were not enough, Plaintiff's own experiences demonstrate that Wexford's failure to follow up on UIC's findings and recommendations regarding the pulmonary nodule was not an isolated incident. Plaintiff also experienced delays in receiving medication prescribed by UIC for atrial fibrillation in 2014 (ECF No. 406, PSOF ¶4) and did not receive the CPAP machine recommended by UIC in 2014 until 2017, despite that Wexford had approved the machine in their collegial review process. (Id. at ¶¶6-7). The record in this case also shows a failure to follow-up from UIC orthopedics' recommendation in December 2015 that Mr. Gevas receive an x-ray of his lumbar spine and return to UIC for follow-up. (Id. at ¶13.)

### IV. There Was Sufficient Evidence of that Wexford Knew of the Obvious Risk of Harm Posed by this Pattern or Practice Yet Failed to Act

This Court noted at summary judgment that both Dr. Ritz and Dr. Fisher had acknowledged reading the Shansky Report, as did IDOC Director Baldwin. Director Baldwin further

6

acknowledged that the problems with follow-up from offsite services identified in the Shansky Report appeared to be the same problems at issue in this lawsuit—Wexford's failure to timely follow up on UIC's recommendation for regular chest CT scans to monitor a known pulmonary nodule and UIC's recommendation that Mr. Gevas receive a CPAP machine for his sleep apnea. ECF No. 432, at 18-19, fn 16. Even if Defendants' corporate witnesses will not directly admit as much, a jury could reasonably conclude that Wexford's lack of a policy to ensure that facility providers reviewed discharge instructions from offsite services and created an appropriate plan for follow-up caused Plaintiff harm, including delaying diagnosis of lymphoma until after it had spread throughout his body, causing a broken rib and clavicle.

Defendants argue that, even if Wexford's corporate representatives read the Shansky Report, the Report was not sufficient to provide notice of widespread problems with follow-up from offsite services at Stateville. ECF No. 436 3-4. They point out that the section on "offsite services" in the body of the Report cites only to one case study, of a patient at Menard, and no case studies at Stateville. *Id.* But this is a red herring, as Defendants diminish what that section says specifically about Stateville and entirely ignore the Stateville-specific supplement to the Report. ECF No. 406-10, 2014 Shansky Report, at 49-189.

The Offsite Services section of the Report noted that many patients returning from offsite services had no follow-up, and that this was "quite common" at Stateville in particular, in as many as 50% or more cases. ECF No. 406-10, 2014 Shansky Report, at 32. The section also noted that scheduling of follow-up appointments with UIC for patients at Stateville was often delayed by up to eight weeks or more. *Id.* at 30. No reasonable reader of this section could conclude, as Defendants suggest, that the only problems with offsite services existed at Menard.

The Stateville supplement contains even more detailed findings regarding failures in scheduling, documentation and follow-up related to offsite services at Stateville specifically. ECF No. 406-10, 2014 Shansky Report, 70-72. In the executive summary section, the experts concluded that:

> [The facility's] urgent/emergent responses frequently reflect problems with the initial assessment and response or with follow-ups after patients return from sendouts. Additionally, scheduled offsite services reflect persistent problems with the timeliness of access to these services or problems with follow-up once the service is provided. And finally, the quality improvement program, which should have identified the programmatic deficiencies and addressed them, is non-functional, including the responses to grievances.

Id. at 53.

These conclusions are bolstered with specific examples of patients *from Stateville* who suffered due to Wexford's inadequate policies and procedures for follow-up on offsite services. The Shansky team found problems in two-thirds or 66% of the Stateville-specific patient charts they reviewed regarding offsite services. *Id.* at 70-72. They found failures to obtain diagnostic tests and failure to maintain in the patient's record the discharge summaries explaining current health concerns and dictating recommended patient care. This surely was sufficient to give Wexford officials notice of a widespread, serious, and obvious risk of harm to patients at Stateville.

## V.      Punitive Damages and Plaintiff's Negligence Claim

Defendants argue that this Court should reconsider its decisions to allow Plaintiff to continue pursuing punitive damages and an institutional negligence claim, based on the same facts and arguments relevant to the *Monell* claim discussed above. ECF No. 435 at 11-12. For the same reasons that Plaintiff's *Monell* claim should survive, Plaintiff's claims for institutional negligence and punitive damages must also survive.

Dated: January 12, 2023

RESPECTFULLY SUBMITTED,

/s/  *Samantha R. Reed*
Samantha Reed
Harold Hirshman
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL  60606
Telephone: (312) 876-8000
Facsimile:  (312) 876-7934
harold.hirshman@dentons.com
samantha@equipforequality.org

**CERTIFICATE OF SERVICE**

  It is hereby certified that on January 12, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel for all parties.

         <u>/s/ Samantha R. Reed</u>

         One of the Attorneys for Plaintiff